**ORIGINAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN D. HOWARD, individually and as
as assignee of Jaime Frankfurt, LLC,

        *Plaintiff,*

    -against-

ANN FREEDMAN, GLAFIRA ROSALES,
KNOEDLER GALLERY, LLC, d/b/a
KNOEDLER & COMPANY, MICHAEL
HAMMER, 8-31 HOLDINGS, INC., JOSÉ
CARLOS BERGANTINOS DIAZ, and JAIME
R. ANDRADE,

        *Defendants.*

ECF CASE

12-CV- **12 CV 5263**

**COMPLAINT
AND DEMAND FOR JURY TRIAL**

Plaintiff John D. Howard ("Howard"), by his attorneys, Lynn I Cahill LLP, as and for his

complaint against defendants, Ann Freedman ("Freedman"), Glafira Rosales ("Rosales"),

Knoedler, LLC, d/b/a Knoedler & Company ("Knoedler"), Michael Armand Hammer, 8-31

Holdings, Inc. ("Hammer's Company") (Hammer's Company and Michael Armand Hammer are

collectively referred to as "Hammer"), José Carlos Bergantinos Diaz ("Bergantinos Diaz"), and

Jaime R. Andrade ("Andrade") alleges as follows:

### SUMMARY OF THE ACTION

1.      This is an action for (1) substantive violations of the Racketeer Influenced and

Corrupt Organizations Act ("RICO"); (2) conspiracy in violation of RICO; (3) breach of

warranty; (4) common-law fraud, (5) aiding and abetting fraud, (6) unilateral mistake; and,

alternatively, (7) mutual mistake. It is the most recent, but almost certainly not the last, in a series

of lawsuits arising from the peddling of forged artwork by an unlawful, concerted and highly

successful enterprise devoted to that purpose. The Federal Bureau of Investigation ("FBI") has an ongoing investigation into these forgeries and one or more of the defendants.

2.    Rosales supplied 20 or more paintings purportedly by some of the world's most notable modern artists, all of which were forgeries. The forgery in this case was purportedly created by Willem de Kooning. Rosales also "discovered" works purportedly by Jackson Pollock, Robert Motherwell, Mark Rothko, Richard Diebenkorn, Clyfford Still, Franz Kline, and Barnett Newman. In each instance, however, the works in question were not created by the artists, but by persons working with, or supplying, her and her live-in companion, Bergantinos Diaz, who has long been associated with forged artworks.

3.    Freedman's principal role in the scheme was to market those 20 or so works (the "Enterprise Works") as coming from the same mysterious male heir of a mysterious collector (whose identity has shifted over the years, but was most commonly described as a Swiss-Mexican man). The "owner," she said, acquired them directly from the artists, usually through a New York art dealer named David Herbert ("Herbert"). Herbert was a real person, who died in 1995, but there is no evidence whatsoever that he played any role in selling the Enterprise Works to the alleged Swiss collector (who has been referred to by some of the defendants as "Mr. X.").

4.    Defendant Andrade, in addition to being a long-time employee of Knoedler, had been involved in a personal relationship with Herbert. Andrade was also the person who had introduced Freedman and Knoedler to Rosales and Bergantinos Diaz. As detailed below, Andrade also facilitated the fabrication of Herbert's involvement with the Enterprise Works after the earlier phony provenance had been shown to be false.

5.    There is no demonstrable provenance (*i.e.*, documented ownership history) for the Enterprise Works. Indeed, in most cases (including this one), it is now known that the

representations concerning provenance were blatantly and demonstrably false. Sales invoices produced only recently by Knoedler in another case demonstrate that Knoedler itself held title to the Enterprise Works, including the Work in this case, having purchased them from Rosales. Thus, even if the Enterprise Works are authentic (and they are not), the misrepresentation concerning provenance was both false and material. The story that the defendants cooked up was a ruse intended to explain why no one in the art world had ever seen or heard of any of the Enterprise Works or the magnificent collection from which they purportedly came before they were delivered to Freedman and Knoedler.

6.      To further aid in the scheme to sell the Enterprise Works, Freedman told many prospective purchasers that some were deemed authentic by an array of leading experts. In fact, few if any of these experts ever stated that any of the Enterprise Works (at least those that have already come to light) were authentic, and a number have disavowed having authenticated any of the works.

7.      At all times relevant to this action, Freedman was the Director and President of Knoedler. Founded in 1846, Knoedler was the oldest gallery in New York City. For over a century, it was one of the city's most respected galleries. Knoedler's role in the sale of the Enterprise Works, at Freedman's behest, was essentially to offer its reputation as a front to the fraudulent enterprise. The idea that a gallery as prestigious as Knoedler would serve as the vehicle for sales of forged artworks exceeding $37 million was (before this fraud came to light) virtually inconceivable, and Freedman, Rosales and the other participants in the enterprise (some of whom are not named and have not yet been identified or, like Bergantinos Diaz's brother, cannot be located) banked on that very inconceivability for the furtherance of their scheme.

Knoedler and its owner, Michael Armand Hammer (through his 8-31 Holdings, Inc.), were greatly and unjustly enriched by the fees generated from the sales of the Enterprise Works.

8.    Although Hammer played a "behind-the-scenes" role in the enterprise, he was an active participant in and beneficiary of the conspiracy to defraud. For example, in 2003 Hammer learned that a leading nonprofit (the International Foundation for Art Research or "IFAR") had deemed it "inconceivable" that the provenance of one of the Enterprise Works had been accurately reported by Knoedler. Hammer, through Hammer's Company, owned and controlled Knoedler. Far from shutting down the pipeline of works from Rosales, Hammer oversaw continuation of the enterprise, saying to Freedman "don't kill the goose that's laying the golden egg." Hammer knew it was quite a goose.

9.    Knoedler purchased the "golden egg" in this case (a painting falsely attributed to de Kooning) for less than 20% of what the gallery sold it to Howard for, just days later. The profit for this painting alone was in the millions, a sufficient incentive for Hammer (who knew more of Knoedler's finances than even Freedman) and the other defendants to ignore any pangs of conscience that might have arisen because not one cent of the purchase price was paid to the son of a Swiss collector. In fact, the bulk of the purchase price was not even paid to Rosales (although she received a payment, including cash (literally) in an amount just short of the amount required to be reported by banking regulations), but to the Spain-based brother of her ill-reputed live-in companion, Bergantinos Diaz. (Knoedler's payment document is annexed to this Complaint as **Exhibit A** and incorporated by reference.)

10.   The work at issue in this case was purportedly created by Willem de Kooning in about 1956-57 and is untitled (the "Work"). As with the other Enterprise Works, the Work was:

4

- Likely created by Bergantinos Diaz or a person or persons supplying or working with him and Rosales;

- purchased by Knoedler from Rosales (at a price so low that it virtually announced its dubious nature) and then sold through Knoedler at a retail market price that a comparable genuine de Kooning could fetch; and

- represented as coming directly from the son of a Swiss collector to whom it had been sold directly by the artist "via" David Herbert to cover for the lack of a true provenance, as well as the fact that Knoedler held title at the time of the sale.

11.     As with other of the Enterprise Works, the sale of the Work was accompanied by other gross misrepresentations. In the case of the Work, Freedman told Howard and an art dealer who facilitated the sale and delivery of the Work that the Work has "singular value because it is a distinctive and rare" de Kooning landscape and of "impeccable quality" from a very private, discerning Swiss collecting family well-known to her and Knoedler directly. In fact, the same expert Knoedler and Freedman rely upon in a related action stated to Freedman in writing prior to the sale to Howard that there were serious doubts about the authenticity of another "de Kooning" in the collection of Enterprise Works. Freedman never disclosed that—or any of the other material and negative information about the Work—to Howard.

12.     Relying on these representations, Howard purchased the Work for $4 million— more than five times what Knoedler had paid for it only days before. Since the defendants insisted that the purported privacy concerns of the purported owner would make inquiries or documentation of provenance impossible, there was little to nothing that Howard could have done to uncover the elaborate fraud himself. Like the other Enterprise Works that have surfaced,

the Work is a forgery and, even were it not, it has far less value given the false, dubious and undisclosed provenance that is actually associated with the Work.

13.     The conduct of the defendants in this case was not merely fraudulent, though it certainly was that. As detailed below, the enterprise was a paradigmatic example of the activity barred under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). As detailed below, there is direct proof of the conduct of an enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961 *et seq.* Further, there is direct proof of a conspiracy among all of the defendants pursuant to 18 U.S.C. § 1962(c).

### PARTIES, JURISDICTION AND VENUE

14.     Howard resides in New York, New York and has previously resided in Chicago, Illinois.

15.     On information and belief, Freedman resides in New York, New York.

16.     On information and belief, Rosales resides in Sands Point, New York.

17.     On information and belief, Knoedler is a Delaware limited liability company, which lists its most recent principal place of business with the New York Secretary of State as 19 East 70th Street, New York, New York but, on information and belief, is actually located at a warehouse somewhere on Manhattan's West Side.

18.     Knoedler's sole member is defendant 8-31 Holdings, Inc., a Delaware corporation which lists its most recent principal place of business with the New York Secretary of State as 19 East 70th Street, New York, New York but, on information and belief, is actually located at a warehouse somewhere on Manhattan's West Side. On information and belief, 8-31 Holdings, Inc. also owns Hammer Galleries, LLC (another art gallery) and Knoedler Archivum, Inc., the

latter of which, on information and belief, owns one of the most-valuable art archives and libraries in the world.

19.     Hammer is (and was, at all relevant times) directly and via Hammer's Company responsible for Knoedler, the managing member of Knoedler, and an officer and director of 8-31 Holdings, Inc., of which he is an owner.

20.     Hammer lists his address with the New York Secretay of State as 9510 Jefferson Boulevard, Culver City, California (the address of a foundation) but, on information and belief, Hammer resides in or near Santa Barbara, California.

21.     On information and belief, Bergantinos Diaz resides in Sands Point, New York.

22.     On information and belief, Andrade resides in New York, New York.

23.     This Court has personal jurisdiction over all of the defendants pursuant to N.Y.C.P.L.R. § 301.

24.     This Court has subject matter jurisdiction over the RICO claims in this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(a), and over the remaining claims pursuant to 28 U.S.C. § 1367.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

## SUMMARY OF FACTS

### A.     Defendant's Illegal Enterprise

26.     At some point prior to 2001, Freedman first met Rosales in a meeting arranged by Andrade.

27.     Andrade had a long personal relationship with Herbert.

28.     Andrade was the executor of Herbert's estate.

29.     Rosales was so little known at that time that Freedman was not aware that she was an art dealer when they first met.

30.     Neither Freedman nor anyone at Knoedler looked into Rosales's background either before or after Freedman's first meeting with her.

31.     On information and belief, Knoedler did not acquire any resale certificate from Rosales.

32.     Rosales developed a business relationship with Knoedler through her meetings with Freedman.

33.     Knoedler sometimes paid Rosales in cash.

34.     In 2007, Rosales signed a letter on Knoedler's letterhead.

35.     At some point prior to November 2007, Freedman became aware that Rosales associated with Bergantinos Diaz.

36.     Freedman claims that she has never made any inquiries about Bergantinos Diaz or the nature of his relationship with Rosales.

37.     On information and belief, Bergantinos Diaz has been accused of, among other things, trafficking in forgeries in Spain as far back as 1999 and of refusing to pay for works that he successfully bid on at a major auction house.

38.     On information and belief, Freedman and Hammer were aware that $711,000 of the purchase price paid by Knoedler for the Work was paid to Bergantinos Diaz's brother in Spain.

39.     On information and belief, at all relevant times, Knoedler had no processes or practices that addressed potential money laundering in connection with art sales transactions.

40.     None of the defendants had any reasonable basis to believe that any of the monies paid for the Work were paid to, or received by, the son of a Swiss collector.

41.     On information and belief, Freedman has represented that Rosales had access to an amazing collection of at least 20 works by a constellation of the leading American postwar modern artists. The works, according to Freedman, had allegedly been acquired, largely in the 1950s, by "Mr. X," a mysterious, secretive, and extremely wealthy man. Prior to the initial meeting with Rosales, "Mr. X" had died and bequeathed the collection to his son, "Mr. X, Jr."

42.     In reality, Rosales and Bergantinos Diaz had access to someone who had created, or was willing and able to create, high-quality forgeries of such works, and Freedman was willing and able to sell those forgeries through Knoedler.

### i. The "Green Pollock"

43.     In late 2001, Knoedler and Freedman conditionally sold a work purportedly by Jackson Pollock named *Untitled 1949* (alternatively called the "Green Pollock") to Jack Levy ("Levy"), a prominent New York banker.

44.     Knoedler and Freedman represented that the Swiss Mr. X had acquired the work through a Filipino artist and collector named Alfonso Ossorio ("Ossorio"), who lived near Pollock on Long Island's East End and who owned works of art by Pollock.

45.     The sale was conditioned on a favorable review of the work's provenance and authenticity by IFAR.

46.     The report issued by IFAR in October 2003 (the "IFAR Report") stated in summary that "IFAR believes that too many reservations exist to make a positive attribution to Jackson Pollock."

47.     The IFAR Report cast doubt on the claim that the work was acquired by Mr. X through Ossorio.

48.     Based on an extensive analysis of the available evidence, the IFAR Report stated that it was "inconceivable" that the Pollock work sold to Levy had passed through Ossorio's hands because the authors of the catalogue raisonné had communicated with Ossorio about his Pollock works (as well as with his knowledgeable brother, Roberto Ossorio) and did not include the "Green Pollock" in the catalogue because Ossorio had never owned it or had it "passed through his hands."

49.     Ossorio never owned the Green Pollock or any of the Enterprise Works.

50.     Ossorio never facilitated any sale or transfer of any of the Enterprise Works.

51.     As a result of the IFAR Report findings, the sale to Levy was canceled and Levy received a sum equal to the millions that he had paid Knoedler for the Green Pollock.

52.     On information and belief, Hammer did not authorize the use of Knoedler funds to reimburse Levy for the Green Pollock.

53.     Following the IFAR Report on the Green Pollock, the defendants did not submit any additional Enterprise Works to IFAR.

54.     Rather than submit additional Enterprise Works to IFAR, the defendants suppressed the report.

55.     Following the IFAR Report, the defendants changed the claimed provenance on Enterprise Works.

56.     Following the IFAR Report, Ossorio was no longer listed in the provenance of the Enterprise Works and "David Herbert" replaced him as the key intermediary behind Mr. X's acquisition.

57.    Herbert kept records of the works of art that he sold.

58.    The artists who allegedly created the Enterprise Works also kept records of works that they sold from their studios.

59.    There are no known records of Herbert having sold the Work or any of the Enterprise Works.

60.    There are no known records of Pollock or any of the artists who purportedly created the Enterprise Works having sold a work from one of their studios through Herbert.

61.    Publicly available archives relating to Herbert contain no documents referencing the sale via Herbert of the Work or any of the Enterprise Works.

62.    On information and belief, no records of the de Kooning Foundation reflects the sale of the Work or any of the Enterprise Works or any involvement by Herbert in "out the back door" sales of works of art actually created by de Kooning.

63.    On information and belief, none of the defendants made any inquiries concerning the Work with the de Kooning Foundation.

64.    On information and belief, none of the defendants made any inquiries concerning Herbert with the de Kooning Foundation.

65.    Freedman sent the IFAR Report concerning the Green Pollock to Hammer after it was issued.

66.    Hammer read the IFAR report concerning the Green Pollock.

67.    Hammer understood that the IFAR report cast doubt on the authenticity of the Green Pollock.

68.    On information and belief, Hammer was interested in having Knoedler continue to sell works brought to Knoedler by Rosales.

69.     On information and belief, Hammer told Freedman with respect to such Rosales-sourced works, "don't kill the goose that's laying the golden egg."

70.     At no time prior to the sale of the Work to Howard did Hammer request a further investigation of the source or authenticity of the Enterprise Works.

71.     Knoedler made further efforts to sell the Green Pollock in 2007 to members of the Taubman family, a family that includes notable art collectors and individuals involved in art businesses.

72.     Freedman never disclosed the IFAR Report to anyone in the Taubman family.

73.     Freedman represented to a member of the Taubman family that the Green Pollock would be included in a revised catalogue raisonné of Pollock works.

74.     The Green Pollock was never included in a revised catalogue raisonné of Pollock works.

75.     The Green Pollock was never considered by anyone for inclusion in a revised catalogue raisonné of Pollock works.

76.     Freedman has admitted under oath that no revised catalogue raisonné of Pollock works has ever been in process.

77.     Knoedler and Freedman knew that there were no plans for a revised catalogue raisonné of Pollock works when Freedman made that representation to a member of the Taubman family.

78.     Freedman rejected the Taubman family's request that Knoedler sign a written agreement with a representation that there had been "no challenges [or] disputes . . . relating to . . . . [the] attribution, authenticity," etc. of the Green Pollock.

79.    Freedman asked that the members of the Taubman family considering the purchase of the Green Pollock accept "our word" about the Green Pollock.

80.    Freedman advised a member of the Taubman family that a Knoedler "invoice is always our legal guarantee."

81.    When Knoedler declined to give the specific representations requested by their attorneys, the Taubman family members declined to purchase the Green Pollock.

### ii.  The De Sole "Rothko"

82.    On or about November 30, 2004, Freedman and Knoedler sold a purported Mark Rothko work called *Untitled, 1956* (the "Rothko Work") to Domenico and Eleanore De Sole (the "De Soles").

83.    Prior to the sale of the Rothko Work, Knoedler and Freedman represented or warranted to both James Kelly, an art professional who worked to facilitate art sales to the De Soles ("Kelly"), and the De Soles that the Rothko Work was a genuine Rothko.

84.    Knoedler and Freedman further represented or warranted that the Rothko Work had been deemed authentic by numerous independent experts.

85.    In fact, most of the experts who purportedly believed the Rothko Work to be authentic did not state an opinion as to its authenticity.

86.    Knoedler and Freedman further represented or warranted that the Rothko Work had been acquired by Mr. X through Herbert.

87.    In fact, the work had been owned by Knoedler since 2002, when it was acquired from Rosales.

88.     The Rothko Work was acquired from Rosales in 2002 in a similar manner to the acquistion of the Work by Knoedler, that is, it was purchased at a fraction of the price paid by the ultimate purchaser with an indemnification from Rosales to Knoedler.

89.     Freedman also represented to Kelly and the De Soles that she knew Mr. X and Mr. X, Jr. personally.

90.     In fact, Freedman has admitted under oath that, even if Mr. X and Mr. X, Jr. are real people, she has no idea of their identities.

91.     Knoedler and Freedman knew these representations concerning the Rothko Work were false when Freedman made them to the De Soles.

92.     When the De Soles learned that other collectors had initiated lawsuits against Knoedler for selling forged works of art, they sought to have the Rothko Work's authenticity tested.

93.     Orion Analytical, LLC ("Orion") is a company that does materials analysis, including those found in works of fine art, for purposes of, among other things, dating and otherwise evaluating works of fine art.

94.     In December 2011, the De Soles engaged Orion to perform tests on the Rothko Work.

95.     On February 6, 2012, Orion issued a report (the "Orion Rothko Report") which provided its findings based on the tests it had conducted on the purported Rothko work.

96.     The Orion Report found that the Rothko Work contained "inconsistencies with Rothko's technique" when compared to known, authentic Rothko works.

97.     The Orion Rothko Report concluded that the "materials and techniques used to create the [Rothko Work] are inconsistent and irreconcilable with the claim that [the Rothko Work] was painted by Mark Rothko."

98.     The Rothko Work is a forgery that was not painted by Mark Rothko.

### iii.  The Enterprise "Motherwells"

99.     On or about February 20, 2007, a former Knoedler employee, Julian Weissman ("Weissman"), sold one of the Enterprise Works purportedly by Robert Motherwell (the "Killala Work") to an art dealer organized in Ireland, Killala Fine Art Limited.

100.    The Killala Work was one of at least seven purported Motherwells that Rosales provided to Knoedler.

101.    Knoedler and Freedman had shown or provided images of four of the seven purported Motherwells to staff members of the Dedalus Foundation, which was established by Motherwell.

102.    Starting in 2002, the Dedalus Foundation began the process of creating a catalogue raisonné of Motherwell's paintings (the "Motherwell Catalogue Raisonné Project").

103.    Knoedler and Freedman did not formally submit any of those four works to the Motherwell Catalogue Raisonné Project.

104.    The Killala work was submitted to the Dedalus Foundation by Weissman.

105.    The Killala work was initially deemed to be authentic by the Dedalus Foundation in a March 2, 2007 Contingent and Conditional Opinion Letter.

106.    However, as the Dedalus Foundation became aware of the amount of similar, previously undocumented works attributed to Motherwell and in possession of Knoedler and Weissman, it decided to further investigate those works.

107.    On or about December 10, 2007, the seven purported Motherwells in Knoedler's possession were placed side by side and examined by members of the Motherwell Catalogue Raisonné Project.

108.    Members of the Motherwell Catalogue Raisonné Project identified anomalies and anachronistic elements when the seven works were viewed together.

109.    The Motherwell Catalogue Raisonné Project concluded that the seven purported Motherwell works are likely forgeries.

110.    On December 12, 2007, Freedman met with the Motherwell Catalogue Raisonné Project to discuss the purported Motherwell works.

111.    At that meeting, Freedman told the members of the Motherwell Catalogue Raisonné Project that she disagreed with their conclusion that the purported Motherwell works are forgeries.

112.    Freedman told members of the Motherwell Catalogue Raisonné Project that the Enterprise Works had been stored in a hermetically sealed basement.

113.    To support her position, Freedman told the Motherwell Catalogue Raisonné Project that she has received authentic paintings by Mark Rothko and Jackson Pollock from the same source.

114.    On March 21, 2008, Orion was engaged by Knoedler to conduct forensic tests on two works of art attributed to Motherwell.

115.    Those two works contained the same provenance as the other Enterprise Works.

116.    Herbert's name appears nowhere in Motherwell's address book or other personal papers.

117.    On October 27, 2008, Orion issued a report (the "Orion Motherwell Report") which provided its findings based on the tests it had conducted on the purported Motherwell works.

118.    The Orion Motherwell Report found that the works contained anomalies inconsistent with known, authentic Motherwell works.

119.    The Orion Motherwell Report concluded that the two works it reviewed were not created by Motherwell.

120.    On the basis of this information, the Dedalus Foundation withdrew its prior authentication of the Motherwell work that had been sold to Killala Fine Art.

121.    The Killala Work has since been affixed with a stamp which states that the Dedalus Foundation "has determined that this painting is not an authentic work by Robert Motherwell but a forgery."

122.    Weissman and Rosales settled a lawsuit concerning that forged Motherwell by repaying Killala's full purchase price.

123.    Rosales indemnified Weissman with respect to claims arising out of the authenticity of Enterprise Works that she sold to him.

124.    Rosales also indemnified Knoedler with respect to Enterprise Works that she sold to Knoedler.

125.    In connection with the Killala dispute, Weissman asserted that Rosales had represented to him that the owner of the work was an artist named Gunther Gerzso.

126.    Gunther Gerszo lived both in Switzerland and in Mexico.

127.    Gunther Gerszo had a son named John Gerzso.

128.    Rosales represented to Weissman that John Gerszo had inherited works of art upon his father's death.

129.    Gunther Gerszo never owned any of the Enterprise Works.

130.    John Gerszo never owned any of the Enterprise Works.

131.    An attorney representing Weissman advised Killala (via its counsel) that Weissman did not know the prior owner of the Killala Work.

132.    Weissman had earlier advised another art dealer that he worked directly with the Swiss, male owner of the Killala Work.

133.    Weissman's statements that he knew the owner and worked directly with the owner of the Killala work are false.

134.    Weissman neither knew the owner of the Killala Work nor any of the alleged owners of other Enterprise Works.

135.    Weissman had no documents concerning the provenance of the Killala Work or any of the Enterprise Works.

136.    All of Rosales's statements about the Gerszos' ownership of any works of art were false when made and she knew them to be false.

137.    Rosales had no reason to believe that the Works were ever owned by Gunther Gerszo or John Gerszo.

138.    Shortly after receiving the Orion Motherwell Report, on October 27, 2008 and again on November 7, 2008, Freedman met with Rosales and with Andrade.

139.    Notes of these meetings establish that Freedman, Rosales and Andrade worked together in an attempt to address the implications of the Orion Motherwell Report and the

inconsistencies in the representations that they had been making about the timing and facts of Herbert's and Ossorio's involvement in the sale of the Enterprise Works.

140.   Defendants' efforts at that time were intended to lower the risk that the Enterprise Works would be exposed as forgeries.

### iv.  The "Silver Pollock"

141.   In November 2007, a purported Jackson Pollock (the "Silver Pollock") was sold to Pierre Lagrange and G&S Trustees Ltd (collectively, "Lagrange").

142.   The Silver Pollock was acquired by Lagrange with the involvement of another art dealer who worked on the sale, Jaime Frankfurt, who operates through Jaime Frankfurt, LLC ("Frankfurt"), on November 6, 2007.

143.   Prior to the sale of the Silver Pollock, Knoedler and Freedman represented to Lagrange via Frankfurt that the Silver Pollock was a genuine painting created by Pollock.

144.   Knoedler and Freedman further represented that the Silver Pollock had been deemed authentic by numerous experts.

145.   In fact, most of the experts who Freedman claimed had seen the Silver Pollock and indicated that it was authentic never stated any opinion as to its authenticity.

146.   Knoedler and Freedman further represented or warranted to both Frankfurt and Lagrange that the Silver Pollock would be included in the next edition of the Pollock catalogue raisonné.

147.   In fact, there was no possibility that the Silver Pollock would be included in a new catalogue raisonné as there were no plans to create a new catalogue raisonné at that time.

148.   Freedman admitted under oath that there was never any revised catalogue raisonné of Pollock works in process.

149.    Nonetheless and contrary to her *sworn*, express understanding that "there wasn't a catalogue raisonné in process," Freedman admitted under oath that she had authored and sent an email intended to assure Lagrange that the Pollock-Krasner Foundation was "mov[ing] forward with plans for a new revised C[atalogue] R[aisonné]."

150.    Freedman's written statement that the Pollock-Krasner Foundation was "mov[ing] forward with plans for a new revised C[atalogue] R[aisonné]" was an intentional lie, just as her statement to a member of the Taubman family that the Green Pollock would be included in the catalogue was an intentional lie.

151.    Eugene Thaw, an author of the Pollock catalogue raisonné and a recognized, highly regarded authority on Pollock had, in fact, advised Knoedler (via one of its paid "experts") that the Silver Pollock "could not be ascribed to Pollock."

152.    Knoedler and Freedman further represented or warranted to both Frankfurt and Lagrange that the Silver Pollock had been acquired by Mr. X through Herbert and was being sold by Mr. X, Jr., who had acquired the Silver Pollock "by descent."

153.    In fact, Knoedler and another art dealer, David Mirvish, had owned the Silver Pollock for years, since approximately 2002.

154.    Knoedler and Freedman knew their representations concerning the Silver Pollock were false when Freedman made them to Frankfurt and Lagrange.

155.    In or about October 2011, Lagrange engaged Orion to run forensic tests on the Silver Pollock.

156.    On November 29, 2011, Orion issued a report (the "Orion Pollock Report") which provided its findings based on the tests it had conducted on the purported Pollock work.

157.    The Orion Pollock Report noted that "[e]xamination and analysis of materials used to create the [Silver Pollock] revealed physical evidence that certain materials are inconsistent with and evidently irreconcilable with the claimed attributes that Jackson Pollock painted the [Silver Pollock] in 1950 – or any other date."

158.    The Orion Pollock Report conclusively "rule[d] out Jackson Pollock as the source of both the [Silver Pollock] and signature."

159.    The Silver Pollock is a forgery that was not painted by Jackson Pollock.

160.    After the issuance of the Orion Pollock Report and in the midst of an ongoing exhibition, Knoedler closed its gallery, which had been in existence for more than 165 years.

#### v.   The Enterprise Works Include at Least Five Fake "Diebenkorns"

161.    On May 6, 2012, THE NEW YORK TIMES reported that Freedman and Knoedler sold five drawings purportedly by Richard Diebenkorn (the "Diebenkorn Works") that his family claims are fakes.

162.    The Diebenkorn Works came to Knoedler with labels from the Vijande Gallery, in Madrid, Spain.

163.    On information and belief, the brother of Bergantinos Diaz lives in Spain.

164.    The Diebenkorn Works were brought to Knoedler and Freedman by Rosales.

165.    Knoedler has transferred hundreds of thousand of dollars to Spain to an account held by the brother of Bergantinos Diaz.

166.    Knoedler and Freedman sold at least one of the Diebenkorn Works to the Kemper family (the "Kemper Diebenkorn").

167.    The Kemper Diebenkorn was donated to the Kemper Museum of Contemporary Art, located in Kansas City, Missouri.

168.   The authenticity of Kemper Diebenkorn was challenged in 2006 by the

Diebenkorn estate.

169.   As a result of the doubts raised by the Diebenkorn estate, the Kemper Museum of

Contemporary Art removed it from display.

170.   After the removal, Freedman relied on Rosales "for help in shoring up the

provenance of the Vijande-gallery Diebenkorns" according to an article published in *Vanity Fair*:

> Rosales interviewed one Cesareo Fontenla, a Spaniard from
> Madrid, who answered a series of questions from Rosales about
> how he came to acquire the paintings from Vijande before they
> went to Knoedler.
>
> Fontenla declared he had a restaurant called Taverna César, located
> on Fleming Street, near La Castellana Plaza, in Madrid, from the
> late 1970s until 1985. It was an artists' hangout: everyone from
> Francis Bacon to Andy Warhol had come through its doors. Many
> were brought to the restaurant by gallery owner Fernando Vijande.
> In 1981 and 1982, Fontenla said, he acquired the Diebenkorn
> works from Vijande, "some as part of a trade for a work by Dalí,
> and some in payment for Mr. Vijande's account at the restaurant."
>
> The gallery did exist, until Fernando Vijande's death, in 1986. But
> Rodrigo Vijande, the late dealer's son, finds Fontenla's story
> incredible. "I would say I know at least 90 percent of the artists
> who went through the gallery," he says when reached in Spain.
> Diebenkorn wasn't one of them. Nor has Rodrigo ever heard of the
> Taverna César. "Both galleries that my father owned in Madrid
> were right where he lived, in front of his house, on Núñez de
> Balboa, in the center of Madrid," Rodrigo notes. "Fleming Street is
> about two or three miles away." Not, perhaps, an implausible
> distance except, says his son, that the gallery owner didn't drive.
> That was why he lived some 50 yards from his galleries.

171.   There is no documentation to support the Rosales's claims about the source of the

"Vijande-gallery Diebenkorns."

### vi.  The Defendants' Own Expert Doubts

**the Authenticity of an Enterprise "de Kooning"**

172.    In connection with their motion to dismiss a lawsuit filed by Lagrange, Knoedler submitted a declaration by Stephen Polcari.

173.    Polcari stated that, in his opinion, the Silver Pollock is authentic, as is the Green Pollock and the De Sole Rothko.

174.    The only one of the Enterprise Works "about which [he] had any questions was one purportedly made by Willem de Kooning."

175.    The Work in this case is a purported "de Kooning."

176.    Polcari's undated report about the "de Kooning" (attached as an exhibit to his declaration, the "Polcari de Kooning Report"), which, on information and belief, was provided to Freedman while she was at Knoedler, states:

> All in all, this work is full of apt quotations that seem very deliberate, very self-conscious, and intended to convince. They do the opposite: they create a Reasonable Doubt despite the closeness to de Kooning's *Woman with Bicycle*.

177.    Thus, even Polcari, who is willing to lend his support to most of the Enterprise Works, was not willing to do so with respect to at least one "de Kooning."

178.    Policari's statement that the work is "intended to convince," etc., strongly implies that Polcari believes the work was created as deliberate forgery.

179.    Even the suggestion that a collection of works purportedly acquired exclusively and directly from individual artists contained a single forgery would cause art professionals acting in good faith to seek a great deal more information about the authenticity of other works of art in that collection than any of the defendants sought about the Enterprise Works.

180.    On information and belief, Knoedler and Freedman continued to sell the Enterprise Works after Polcari issued his report on the "Reasonable Doubt de Kooning."

181.    On information and belief, none of the defendants required any additional proof of authenticity with respect to sold or unsold Enterprise Works from Rosales or anyone after Polcari issued his report on the "Reasonable Doubt de Kooning."

182.    Knoedler and Freedman did not disclose the Polcari Report to potential purchasers of the Enterprise Works, including Howard.

### vii.   Hammer Is an Integral Part of the Fraudulent Enterprise

183.    As noted, Hammer knew about the enterprise as early as 2003.

184.    Hammer approved of the Enterprise Works and Rosales as "the goose laying the golden egg."

185.    Hammer, via Hammer's Company, was effectively Knoedler's beneficial owner and controlliong member at all times relevant to this complaint.

186.    Hammer ultimately oversaw the finances and administration of Knoedler.

187.    Freedman has testified that she "never saw any paperwork on the insurance" and that her access to the financial statements of Knoedler and its assets was "limited."

188.    Freedman's successor as President at Knoedler testified that Hammer acted as the "chairman" of Knoedler.

189.    At all relevant times, Hammer was aware of payments made by Knoedler.

190.    At all relevant times, Hammer was aware of monies received by Knoedler.

191.    At all relevant times, Hammer was aware that cash payments were made to Rosales.

192.    At all relevant times, Hammer was aware that monies were wired by Knoedler to the brother of Bergantinos Diaz in Spain.

193.    At all relevant times, Hammer was aware that no monies for Enterprise Works were ever sent to the male heir of a Swiss Collector.

194.    On information and belief, Freedman was given a forced leave of absence by Knoedler with little prior notice on October 16, 2009.

195.    On information and belief, Freedman's forced leave of absence came not long after a subpoena was served on Knoedler by the FBI.

196.    On information and belief, Hammer caused Knoedler to force Freedman to take a forced leave of absence.

197.    On information and belief, Freedman's departure from Knoedler (via a forced 30-day "leave of absence") was abrupt, so abrupt and under such a cloud of suspicion that she was escorted out of Knoedler's building and denied the opportunity even to remove a personal envelope from her desk.

198.    On information and belief, the way in which Knoedler closed the door on its 32-year relationship with Freedman was intended by Knoedler to send a hard message and was felt by Freedman to have been hard.

199.    On information and belief, Freedman's suspension from Knoedler resulted in part from the investigation into Knoedler's sale of the Enterprise Works.

200.    On information and belief, Hammer and Knoedler sought to disassociate from Freedman by forcing her to take a leave of absence.

201.    The FBI is conducting a continuing investigation into the circumstances surrounding the sale of the Enterprise Works.

202.    At the time of Freedman's suspension, Hammer, who was by then fully aware of the enterprise, could have mitigated the harm suffered by its victims by disclosing the information that had come to light concerning the Enterprise Works.

203.    Instead, Hammer continued the enterprise by not disclosing what he and others at Knoedler knew about the enterprise to its victims.

204.    On information and belief, Hammer made the decision to end Knoedler's gallery operations shortly after receipt of the Orion Pollock Report.

205.    On information and belief, Knoedler's publicly announced plans to seek new, museum quality space were ongoing at the time that its gallery operations were closed.

206.    By ending Knoedler's gallery operations so abruptly, Hammer diminished the value of Knoedler's assets (including the value of the Knoedler name and any authentic works of art that it may own), which will ultimately make it more difficult for victims of the enterprise to be compensated.

207.    On information and belief, by terminating Knoedler's gallery operations abruptly, Hammer intended to convey that it would be difficult to recover damages from Knoedler and to create a disincentive for lawsuits to be filed against Knoedler that would reveal information about the enterprise.

208.    On information and belief, whatever financial losses Knoedler may have experienced prior to its closing were immaterial to Hammer, who had publicly stated that he was optimistic about the gallery's future and that the 165-year-old gallery had often weathered change and turbulence.

209.    Hammer ultimately profited (through Knoedler and Hammer's Company, Knoedler's nominal owner) on each sale of an Enterprise Work.

210.    Hammer's role in sustaining the enterprise renders him fully liable for the damages he, and the other defendants, caused.

**B.    The Sale of the Work to Howard**

**1.    The Armory Show**

211.    Knoedler participated in an art fair held at the New York Armory on Park Avenue in February 2007 (the "Armory Show").

212.    Among the works of art that Knoedler displayed and offered for sale was the Work, which it attributed to de Kooning.

**a.    Art Trade Custom and Practice re Authenticity Issues**

213.    Freedman has stated that it is a custom and practice in the art trade for art dealers and other knowledgeable persons to advise an exhibiting dealer when a work of art is not "right," *i.e.*, that he or she has doubts about the work's authenticity.

214.    Freedman has stated that the absence of negative comments about a number of the Enterprise Works from art dealers and other knowledgeable persons was effectively an endorsement of the authenticity of those works, a silent "consensus" that they were "right."

215.    Freedman's description of the customs and practices in the art world as described in the preceding two paragraphs are inaccurate.

216.    The actual customs and practices in the art world with respect to the meaning of silence in the presence of a work of art which an art dealer or other knowledgeable person believes is "not right" (*i.e.*, of doubtful authenticity) are directly contrary to what Freedman has stated.

217.    It is not the custom and practice for an art dealer or other knowledgeable person to comment on a work of art that he or she believes to be of questionable authenticity.

218. On information and belief, there have been a number of works of doubtful authenticity at the New York Armory Show (including those displayed by Knoedler) and none of those displaying such works have ever been urged to take such a work "down off the wall" as Freedman has stated would be the case if Knoedler exhibited works of doubtful authenticity.

219. The general (and increasing) reluctance of art dealers, scholars and other knowledgeable persons to comment on the authenticity of art works makes it difficult for even sophisticated art collectors to be certain that they are purchasing genuine works of art.

220. Most collectors, as Freedman advised a member of the Taubman family, rely on the "word" and reputation of the selling art gallery and do regard the gallery's invoice as a "legal guarantee."

**2.      Howard's Interest in the Work at the Armory Show**

221. Howard visited the Armory Show in February 2007.

222. Frankfurt visited the Armory Show in February 2007.

223. Howard viewed the Work in a space occupied by Knoedler at the Armory Show.

224. Frankfurt also viewed the Work in a space occupied by Knoedler at the Armory Show.

225. At some point in time, Frankfurt introduced Howard to Knoedler and Freedman.

226. Howard discussed the Work with Freedman.

227. Frankfurt discussed the Work with Freedman.

228. Freedman and Howard also met at Knoedler's gallery to discuss the Work.

229. Freedman and Howard also communicated about the Work through Frankfurt.

**3.      Freedman and Knoedler's Representations and Omissions**

230. Freedman told Howard directly that:

28

    a.    the Work has "singular value because it is a distinctive and rare" de Kooning landscape;

    b.    the Work was a de Kooning of "impeccable" quality and provenance;

    c.    the Work was owned by a man whom she knew directly;

    d.    the Work was owned by a man who had acquired the Work through an inheritance from his father;

    e.    the owner of the Work and his family were very private and would not permit her to identify him (or them) under any circumstances;

    f.    the owner of the Work and his family lived in Switzerland; and

    g.    the provenance of the work was above reproach as demonstrated by the fact that she had "personally" purchased a Motherwell directly from the same owner.

231.    In substance, Freedman and Knoedler provided the same information to Frankfurt as that set forth in the preceding paragraph.

232.    Freedman and Knoedler did not tell Howard anything negative about the Work or its provenance, including that:

    a.    the Work had been delivered to her by Rosales;

    b.    neither Freedman nor anyone at Knoedler had ever met the purported owner of the Work;

    c.    neither Freedman nor anyone at Knoedler knew the name of the owner or his father;

    d.    neither Freedman nor anyone at Knoedler, like most art dealers, knew much about Rosales;

e.  Freedman and Knoedler had been introduced to Rosales by Andrade, who had been Herbert's long-time companion and a relatively low-level employee of Knoedler;

f.  Ossorio was initially identified as having facilitated the sale of works to the owner's father, but there was no record of Ossorio having any connection with works of art delivered to Knoedler by Rosales;

g.  subsequent assertions that Herbert had facilitated the sale of works to the owner's father were also undocumented (*e.g.*, in Herbert's papers, Motherwell's papers, de Kooning's papers, Pollock's papers, etc.);

h.  the sale of a work purchased from Rosales and sold to Levy had been cancelled;

i.  members of the Taubman family had delined to purchase a work delivered by Rosales because Knoedler, via Freedman, had adamantly refused to give specific guarantees about its authenticity;

j.  many of the Enterprise Works were anomalously small in size in comparison with other genuine works by some of the artists who purportedly created them;

k.  the vast preponderance of sale proceeds paid by Knoedler to Rosales for the Work and other Enterprise Works would be paid to the Spanish brother of Bergantinos Diaz;

l.  Bergantinos Diaz had been associated with disreputable art world activities, including the peddling of forgeries and not paying for works purchased at auction;

m.    questions and doubts had been raised about other works delivered to her by Rosales, including questions and doubts raised by IFAR, the Motherwell Catalogue Raisonné Committee, and Eugene Thaw; and

n.    questions and doubts about a work delivered by Rosales and attributed to de Kooning had been raised by Polcari, Knoedler's own paid expert.

233.    Freedman and Knodler failed to provide Frankfurt with the same information in substance set forth in the preceding paragraph.

234.    Knoedler's sale invoice described the Work as follows:

**Willem de Kooning** (1904-1997)
*Untitled*
Oil on paper mounted on masonite
20 ½ x 29 inches
Signed at upper right corner: "de Kooning"
A 12537
CA 26933

**Provenance**

The artist (via David Herbert*)
Private collection
By descent to present owner

*David Herbert often acted both as agent for the artist and as advisor to the collector.

235.    These descriptions constitute express warranties that the Work was by Willem de Kooning and that the provenance was as stated.

236.    Freedman made the same representations to Howard orally and directly prior to his purchase of the Work.

237.    In substance, Freedman made the same representations to Frankfurt that she had made to Howard.

### 4. Howard's Purchase of the Work

238.    Knoedler delivered the Work to one of Howard's residences so that he could "live with it" before deciding whether to purchase it.

239.    Howard decided to purchase the Work in or about June 2007.

240.    Howard negotiated the purchase price for the Work directly with Freedman.

241.    Howard and Freedman agreed that the purchase price for the Work would be $4,000,000.

242.    Howard requested Frankfurt's assistance in completing the purchase of the Work.

243.    To reward Frankfurt for introducing Howard to Knoedler and the Work, Knoedler, without prior communication with Frankfurt or Howard about any sum to be retained by Frankfurt, sent Frankfurt an invoice for the Work, dated June 13, 2007, in the amount of $3,500,000 so that Frankfurt could retain $500,000 in connection with the sale of the Work.

244.    Knoedler sent the invoice to Frankfurt to avoid disclosing to Howard how much Frankfurt would receive for facilitating the sale.

245.    Knoedler did not sell the Work to Frankfurt.

246.    Frankfurt denies having done anything wrong with respect to the sale of the Work but has unconditionally paid Howard $500,000 because, as he has represented, he believes that it is right to have done so.

247.    Frankfurt has also assigned to Howard any and all of his claims arising out of the sale of the Work, including but not limited to, all of his claims against all of the current defendants.

248.    Knoedler and Freedman never believed that it was selling the Work to Frankfurt.

249.    Knoedler and Freedman knew that Frankfurt would not pay for the Work until Howard had provided funds and that Frankfurt was not using funds other than Howard's to pay for the Work.

250.    Knoedler did not receive payment for the Work from Frankfurt until after Howard had transferred funds to Frankfurt.

251.    Knoedler's permitting Frankfurt to keep $500,000 in connection with the sale (12.5% of the purchase price) is generous when measured by the customs and standards in the art trade, where commissions of five percent or less are not uncommon.

252.    Knoedler sent the invoice to Frankfurt to induce and to encourage Frankfurt to introduce other potential purchasers of the Enterprise Works.

### 5. Knoedler's Purchase of the Work from Rosales

253.    Notwithstanding the $500,000 it allowed Frankfurt (operating through Jaime Frankfurt, LLC) to keep, Knoedler made an enormous profit on the sale of the Work to Howard, far and above the norm in the art trade.

254.    On information and belief, there is no agreement documenting the consignment of the Work to Rosales.

255.    On information and belief, the Work was not consigned to Rosales.

256.    There is no agreement documenting the consignment of the Work by Rosales or anyone else to Knoedler.

257.    The Work was not consigned to Knoedler.

258.    On June 11, 2007, two days before Knoedler sold the Work to Howard, it purchased the Work from Rosales herself for $750,000.

259.    Put another way, Knoedler paid Rosales less than 20% of what Howard paid for the Work.

260.    Knoedler's payment documents show that that Rosales was paid $9,000 in cash.

261.    Knoedler made the $9,000 cash payment, for the purpose of helping Rosales avoid a requirement (set forth 31 U.S.C. § 5234) that cash transactions in excess of $10,000 be reported.

262.    Knoedler's payment documents also provided that Rosales would receive a check for $31,000.

263.    The remaining $711,000 was sent by wire to Jesus A. Bergantinos in Spain.

264.    Jesus A. Bergantinos and defendant Bergantinos Diaz are brothers.

**6.     Issues Raised by Knoedler's Purchase and Sale of the Work**

265.    The sales documentation from Knoedler set forth no prior provenance at all, much less a private Swiss owner, a Swiss-Mexican collector, or Herbert.

266.    Knoedler's own papers demonstrate that it purchased the Work from Rosales in the first instance and sold it to Howard based on a false provenance.

267.    The provenance provided by Knoedler, Freedman and Rosales for the Work is false.

268.    The false provenance provided by Knoedler, Freedman and Rosales for the Work was provided knowingly or with conscious or reckless disregard for its truth.

269.    The representations and warranties provided by Knoedler concerning the authenticity of the Work were false.

270.    The representations and warranties provided by Knoedler concerning the authenticity of the Work were provided knowingly or with conscious or reckless disregard for their truth.

271.    The defendants simply lied to Howard, Frankfurt and others about what they knew about the Work, the Enterprise Works, and their provenance.

272.    What the provenance of works of fine art such as the Work was represented to be substantially affects its market value.

273.    Knoedler could not have sold the Work to Howard for $4 million (or any sum in the millions of dollars) if it accurately represented its provenance and disclosed the information it had concerning works supplied by Rosales.

274.    Because, *inter alia*, the Work had virtually no provenance, Knoedler paid only $750,000 in connection with its acquisition by Knoedler.

275.    No genuine work of art by de Kooning with a $4 million retail sale value could be purchased in good faith for $750,000.

276.    The price paid by Knoedler for the Work, by itself, raises, and, on information and belief, did raise for Knoedler and Freedman, issues about the authenticity of the Work.

277.    Knoedler acquired the Work with actual knowledge that the Work was a forgery or consciously disregarded facts, such as the inexplicably low purchase price, that raised issues about the authenticity of the Work.

278.    On information and belief, Hammer knew that (a) the Work and other Enterprise Works had been purchased at prices far below their market values, (b) the Work and other Enterprise Works were acquired through payments made in part [i] in cash to Rosales and [ii] by wire to Spain, (c) there was no reasonable basis to believe that any funds had ultimately been

35

paid to the male heir of a Swiss collector, and (d) purchasers such as Howard had paid multiples of what Knoedler had paid to acquire Enterprise Works.

279.    Howard relied on the representations from Freedman and Knoedler set forth above (*e.g.*, in ¶ 230).

280.    Howard understood, and relied upon, Knoedler's and Freedman's explicit and implicit representations that its "word" was a "legal guarantee" that if the Work purchased proved of doubtful authenticity, Knoedler would refund the money that he had paid for the Work.

281.    Howard relied on the representations of Freedman and Knoedler set forth above (*e.g.*, in ¶ 230) in agreeing to purchase the Work.

282.    Howard continued to rely on the representations of Freedman and Knoedler, *inter alia*, by insuring the Work at amounts consistent with the high value placed on the Work by Knoedler and Freedman.

283.    Frankfurt relied on the representations of Freedman and Knoedler set forth above (*e.g.*, in ¶ 231).

284.    Howard's reliance on the representations of Freedman and Knoedler set forth above (*e.g.*, in ¶ 230) was reasonable because of Knoedler's and Freedman's reputations and their representation that the owner of the Work had insisted on remaining anonymous.

285.    Frankfurt's reliance on the representations of Freedman and Knoedler set forth above (*e.g.*, in ¶ 230) was reasonable because of Knoedler's and Freedman's reputations and their representation that the owner of the Work had insisted on remaining anonymous.

286.    The representations of Freedman and Knoedler were material as they affected the Work's value and Howard's willingness to purchase the Work.

287. Howard would not have purchased the Work if he had known that the representations of Freedman and Knoedler set forth above (*e.g.*, in ¶ 230) were false in material respects.

288. Howard would not have purchased the Work if he had known about the material omissions of Freedman and Knoedler set forth above (*e.g.*, in ¶ 232).

289. Frankfurt would not have facilitated Howard's purchase of the Work if he had known that the representations of Freedman and Knoedler set forth above (*e.g.*, in ¶ 230) were false in material respects.

290. Frankfurt would not have facilitated Howard's purchase of the Work if he had known about the material omissions of Freedman and Knoedler set forth above (*e.g.*, in ¶ 232).

291. When the fraud concerning other Enterprise Works came to light in the media, Howard made inquiries concerning the Work (including an analyis into the materials used to create the Work).

292. The Work is worth substantially less than Howard paid for it because its provenance is not as Freedman and Knoedler represented it to be.

**7.    Other Issues with the Work**

293. The Work contains one or more materials that are not found in works of art created at the time that Knoedler and Freedman represented that the Work was created.

294. The Work contains one or more materials that are found in other forgeries sold by Knoedler.

295. The Work contains one or more materials that were not commercially available at the time that Knoedler and Freedman represented that the Work was created.

296.     On information and belief, Knoedler and Freedman have no documents demonstrating that one or more of the materials not commercially available at the time that the Work was purportedly created and yet found in the Work were used by de Kooning in any de Kooning work accepted as genuine.

297.     On information and belief, the Work has one or more characteristics that reflect a conscious intention to deceive those viewing the Work concerning its true authorship, *i.e.*, it is a fake created in the style of de Kooning and meant to pass for a genuine painting created by de Kooning.

298.     On information and belief, there are no documents in the archives of Herbert that reflect sales (out a "back door" or otherwise) by Herbert of the Work or any of the Enterprise Works.

299.     On information and belief, there are no documents in any de Kooning archives, or any scholarly materials concerning de Kooning, that concern a sale of the Work or any sales of any genuine de Kooning works directly from de Kooning "via" Herbert to any collector, Swiss, Mexican or otherwise.

300.     On information and belief, no documents exist indicating that the Work or any of the Enterprise Works were ever publicly or privately exhibited before being delivered to Knoedler.

301.     On information and belief, no documents exist indicating that the Work or any of the Enterprise Works were ever appraised.

302.     On information and belief, no documents exist indicating that the Work or any of the Enterprise Works were ever insured prior to being delivered to Knoedler for at or close to their fair market or retail replacement value.

303.     On information and belief, no documents exist indicating that the Work or any of

the Enterprise Works were lawfully imported to, or exported from, the United States of America.

304.     The Work is a forgery.

**FIRST CLAIM FOR RELIEF**
**(Violation of 18 U.S.C. § 1962(c) – Against All Defendants)**

305.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 304

of this Complaint as if fully set forth herein.

306.     The association-in-fact of the defendants constitutes an enterprise engaged in and

affecting interstate and foreign commerce within the meaning of 18 U.S.C. §§ 1961(4) and

1962(c).

307.     Each of the defendants is a "person" within the meaning of 18 U.S.C. § 1961(3),

and is separate from the enterprise.

308.     The principal purpose of the enterprise was the marketing and sale of the

Enterprise Works (*i.e.*, artworks that were attributed to famous 20th century American artists such

as Willem de Kooning, Jackson Pollock, Mark Rothko, Robert Motherwell and Richard

Diebenkorn that were forged to appear as though they were created by the artists to whom they

were attributed). Its purpose was thus to effect the defendants' fraudulent scheme.

309.     Operating through the enterprise, the defendants and others, including Weissman,

engaged in a pattern of racketeering activity beginning no later than 2001, and likely several

years earlier.

310.     The activity consisted of a series of acts with a common purpose (the marketing

and sale of the Enterprise Works) that lasted over a period of a decade or more, and that posed

(and may still pose) a continued threat of criminal activity.

311.    The defendants and others committed numerous predicate acts of racketeering activity in connection with the enterprise within the meaning of 18 U.S.C. 1961(1). Such activity includes, but is not necessarily limited to, numerous and repeated violations of 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to wire fraud) and 18 U.S.C. § 2318 (relating to trafficking in counterfeit labels with respect to works of visual art).

**18 U.S.C. § 2318**

312.    Section 2318 provides in relevant part that

Whoever, in any of the circumstances described in subsection (c), knowingly traffics in—

(A) a counterfeit label or illicit label affixed to, enclosing, or accompanying, or designed to be affixed to, enclose, or accompany—

\*        \*        \*

(vi) a work of visual art;

shall be fined under this title or imprisoned for not more than 5 years, or both.

313.    Subsection (c) requires that the offense be committed in the United States, that it use the mail or a facility of interstate or foreign commerce, and that "the counterfeit label or illicit label is affixed to, encloses, or accompanies, or is designed to be affixed to, enclose, or accompany . . . a work of visual art."

314.    Although forgeries, the Enterprise Works are works of visual art within the meaning of the statute.

315.    In this case, the counterfeit label – de Kooning's forged signature – was affixed directly to the Work.

316.    All of the approximately 20 Enterprise Works identified in this Complaint likewise had a forged signature affixed directly to the work in question or were accompanied by a label falsely attributing authorship of the work.

317.    Each, including the Work here, was trafficked in the United States and shipped via mail or other interstate common carrier.

318.    Moreover, payments for each work were transmitted via mail, wire, or another similar facility of interstate or foreign commerce.

**18 U.S.C. §§ 1341 and 1343**

319.    Section 1341 outlaws the use of a facility of the United States Postal Service or "any commercial or private interstate carrier" in connection with a fraudulent scheme or artifice. Section 1343 outlaws the use of "wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

320.    In this case alone, members of the enterprise engaged in multiple e-mails and telephone calls with Howard and Frankfurt.

321.    The defendants shipped the Work to Howard via common carrier, and paid and received funds via wire or mail.

322.    Each of these patterns was repeated each time an Enterprise Work was marketed and/or sold.

323.    Moreover, the defendants communicated among themselves by mail and wire. For example, Freedman faxed the IFAR Report to Hammer in 2003, and shortly thereafter, the two had the "don't kill the goose laying the golden egg" conversation by telephone.

41

324.    Upon information and belief, there were scores of additional phone conversations, e-mail exchanges and other relevant communications between and among the defendants.

325.    The defendants received $3.5 million from Howard for the purchase of the forged Work. Because the payment was a direct result of the operation of the enterprise, it constitutes an actionable injury pursuant to 18 U.S.C. 1964(c).

### SECOND CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(d) – Against All Defendants)

326.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 325 of this Complaint as if fully set forth herein.

327.    The defendants, Weissman, and others not known to Howard, violated 18 U.S.C. § 1962(d) by conspiring to commit the actions, detailed in this Complaint, in violation of 18 U.S.C. § 1962(c).

328.    As alleged herein, the conspiracy was initiated by the agreement of Freedman, Knoedler, Rosales, Bergantinos Diaz and Andrade no later than 2001.

329.    Hammer joined the conspiracy no later than 2003 when, among other things, he became aware of the IFAR Report, participated in its suppression and condoned the creation of a new, undocumented provenance for the Enterprise Works that he knew was false, *inter alia*, by virtue of the size of payments made to acquire the Enterprise Works in relation to the sale prices, the persons to whom the payments were made, and the places in which those receiving payments were located.

330.    The defendants' actions demonstrate that each agreed to participate in the conspiracy, and committed overt acts in furtherance thereof. Each was aware of the participation

of the other defendants, or, at the very least, knew the general nature of the conspiracy and that it extended beyond his or her direct participation.

331.    The conspiracy, in essence, consisted of an agreement to conduct the affairs of the enterprise – *i.e.*, first to establish it and then to maintain its operation and reap its benefits. The purpose of the enterprise and thus, the conspiracy, was, as noted, the marketing and sale of the forged Enterprise Works, including the Work in this case. Thus, the defendants knew that the enterprise would be operated through a pattern of racketeering activity.

332.    The defendants received $3.5 million from Howard for the purchase of the forged Work. Because the payment was a direct result of the operation of the conspiracy, it constitutes an actionable injury pursuant to 18 U.S.C. § 1964(c).

### THIRD CLAIM FOR RELIEF
### (Fraud – Against Freedman and Knoedler)

333.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 332 of this Complaint as if fully set forth herein.

334.    Defendants Freedman and Knoedler fraudulently induced Howard to purchase the Work by knowingly misrepresenting that the Work was authentic when, in truth, the Work is a forgery.

335.    Defendants Freedman and Knoedler fraudulently induced Howard to purchase the Work by knowingly misrepresenting that the Work came directly to Knoedler from an individual, whom Knoedler and Freedman knew personally (and from whom Freedman had purchased a work), who inherited it from his father (a wealthy Swiss collector), who obtained it directly from the artist (with the assistance of Herbert).

336.    In truth, Freedman and Knoedler did not know the son of a collector who had originally obtained the Work purportedly from the artist, and had in fact purchased the Work themselves directly from Rosales through cash payments and wire transfers to her live-in companion's brother in Spain purportedly without even a cursory look into any of their backgrounds.

337.    Defendants Freedman and Knoedler fraudulently induced Howard to purchase the Work by knowingly misrepresenting that the Work has "singular value because it is a distinctive and rare" de Kooning landscape and of "impeccable quality" and provenance, when in reality Freedman and Knoedler knew that the Work was a forgery.

338.    Freedman's and Knoedler's misrepresentations were material because Howard would not have purchased the Work had he known them to be false.

339.    Howard's reliance on these misrepresentations was reasonable given, among other things, Freedman's and Knoedler's superior knowledge, Knoedler's 165-year-old reputation as one of the world's finest art galleries, and explicit and implicit assurances that its invoices were a "legal guarantee" that works of doubtful authenticity could be returned for a refund of the purchase price.

340.    Howard was unable to obtain additional information about the Work because Knoedler and Freedman refused to disclose the identity of the purported Swiss collector or his son, the purported heir and current owner "by descent" of the Work.

341.    Howard could not have discovered the truth concerning defendants' material misrepresentations because it was either kept confidential or known only by the defendants.

342.    In reliance on Freedman's and Knoedler's material misrepresentations and omissions, Howard was damaged in the amount of at least $3.5 million.

343.   Because Freedman and Knoedler engaged in the fraudulent conduct stated in this Complaint willfully and maliciously, and with the intent to damage Howard, Howard is entitled to an award of punitive damages.

## FOURTH CLAIM FOR RELIEF
### (Fraudulent Concealment – Against Freedman and Knoedler and Hammer)

344.   Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 343 of this Complaint as if fully set forth herein.

345.   Defendants Freedman, Knoedler and Hammer fraudulently concealed from Howard facts about which the defendants had superior knowledge, which information was not readily available to Howard, and the defendants intended and understood that Howard would purchase the Work on the basis of the incomplete and incorrect information the defendants provided to Howard.

346.   If Howard had known the facts that Freedman, Knoedler and Hammer had concealed from him, he would not have purchased the Work.

347.   Among other things, Freedman, Knoedler and Hammer did not tell Howard that:

    a.   the Work had been delivered to her by Rosales;

    b.   neither Freedman nor anyone at Knoedler had ever met the purported owner of the Work;

    c.   neither Freedman nor anyone at Knoedler knew the name of the owner or his father;

    d.   neither Freedman nor anyone at Knoedler, like most art dealers, knew much about Rosales;

e.    Freedman and Knoedler had been introduced to Rosales by Andrade, who had been Herbert's long-time companion and a relatively low-level employee of Knoedler;

f.    Ossorio was initially identified as having facilitated the sale of works to the owner's father, but there was no record of Ossorio having any connection with works of art delivered to Knoedler by Rosales;

g.    subsequent assertions that Herbert had facilitated the sale of works to the owner's father were also undocumented (*e.g.*, in Herbert's papers, Motherwell's papers, de Kooning's papers, Pollock's papers, etc.);

h.    the sale of a work purchased from Rosales and sold to Levy had been cancelled;

i.    members of the Taubman family had declined to purchase a work delivered by Rosales because Knoedler, via Freedman, had adamantly refused to give specific guarantees about its authenticity;

j.    many of the Enterprise Works were anomalously small in size in comparison with other genuine works by some of the artists who purportedly created them;

k.    the vast preponderance of sale proceeds paid by Knoedler to Rosales for the Work and other Enterprise Works would be paid to the Spanish brother of Bergantinos Diaz;

l.    Bergantinos Diaz had been associated with disreputable art world activities, including the peddling of forgeries and not paying for works purchased at auction;

m.     questions and doubts had been raised about other works delivered to her by Rosales, including questions and doubts raised by IFAR, the Motherwell Catalogue Raisonné Committee, and Eugene Thaw; and

n.     questions and doubts about a work delivered by Rosales and attributed to de Kooning had been raised by Polcari, Knoedler's own paid expert.

348.   Freedman, personally, is liable for fraudulent concealment because she perpetrated the fraudulent concealment and thus participated in the alleged fraud or had actual knowledge of it.

349.   Knoedler is liable for fraudulent concealment because Freedman perpetrated the fraudulent concealment in her capacity as President of Knoedler.

350.   Hammer, personally, is liable for fraudulent concealment because he was, operating through Hammer's Company (of which he is the sole owner), effectively the beneficial owner and controlling member of Knoedler, directed many of the fraudulent activities and concealment, and had actual knowledge of the alleged fraud.

351.   Hammer's Company is liable for fraudulent concealment because it was effectively the beneficial owner and controlling member of Knoedler, directed many of the fraudulent activities and concealment, and had actual knowledge of the alleged fraud.

352.   Freedman, Knoedler and Hammer's failure to disclose the truth and facts about the Work and the Enterprise Works has damaged Howard because he would not have purchased the Work had he known these facts.

353.   Many of the defendants' disclosures were either false or misleading partial disclosures designed to induce Howard to purchase the Work.

354.   The true provenance of the Work, which at all times was known to Freedman, Knoedler and Hammer and hidden from Howard – that it is from Rosales and Bergantinos Diaz, and has no known source other than them – renders the Work effectively valueless.

355.   The Work is valueless for the additional reason that it is not a genuine de Kooning.

356.   As a result of the defendants' failure to provide Howard with the full information at only the defendants' disposal, Howard – as the defendants intended – purchased the Work and suffered damages as a result of paying $4 million for a work that cannot be sold as a de Kooning.

357.   Howard could not have discovered the undisclosed information because it was either kept confidential or known only by the defendants.

358.   Because the defendant engaged in the fraudulent conduct stated in this Complaint willfully and maliciously, and with the intent to damage Howard, Howard is entitled to an award of punitive damages.

## FIFTH CLAIM FOR RELIEF
### (Conspiracy to Commit Fraud – Against Freedman and Knoedler and Hammer)

359.   Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 358 of this Complaint as if fully set forth herein.

360.   Defendants Freedman, Knoedler and Hammer perpetrated a fraud on Howard as set forth in this Complaint.

361.   These defendants maintained a corrupt agreement and enterprise in which they knowingly misrepresented the provenance of paintings provided by Rosales for the purpose of selling the forged works as authentic.

362.     Each of these defendants committed an overt act in furtherance of the conspiracy by falsely stating the provenance of the Work, both orally and in writing.

363.     Hammer went as far as to warn Freedman "don't kill the goose that's laying the golden egg."

364.     Freedmen, as President of Knoedler, and Hammer, as the principal of Knoedler, were members of the conspiracy to defraud art collectors, like Howard, along with Knoedler.

365.     As a result of the conspiracy to commit fraud, Howard has suffered damages.

366.     Because the defendants engaged in the conspiracy to commit fraud stated in this Complaint willfully and maliciously, and with the intent to damage Howard, Howard is entitled to an award of punitive damages.

**SIXTH CLAIM FOR RELIEF**
**(Aiding and Abetting Fraud – Against Hammer)**

367.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 366 of this Complaint as if fully set forth herein.

368.     Defendants Knoedler and Freedman perpetrated a fraud on Howard as set forth in this Complaint.

369.     Hammer knew of the fraud enterprise as early as 2003 as set forth in this Complaint by virtue of the IFAR Report.

370.     Hammer had knowledge of the fraud that was perpetrated on Howard, *inter alia*, by virtue of the size of payments made to acquire the Work in relation to the purchase price paid by Howard, the persons to whom the payments were made, and the places in which those receiving payments were located.

371.     Hammer provided substantial assistance in effectuating the fraud on Howard.

372.    Hammer provided substantial assistance by, among others, affirmatively directing Freedman and Knoedler to continue to sell forged works purveyed by Rosales, *e.g.*, by urging that she not "kill the goose that's laying the golden eggs."

373.    Hammer also provided substantial assistance by failing to act to stop the fraud despite his knowledge of the fraud since 2003 and his position as the effective beneficial owner and controlling member of Knoedler.

374.    Hammer, who effectively controlled Knoedler, had a duty to disclose the essential facts concerning the false provenance and the authenticity doubts that existed about the Enterprise Works, including the Work.

375.    Hammer's actions in assisting and concealing the fraud, and his inaction in failing to disclose the fraud are the proximate cause of the damages Howard has suffered.

### SEVENTH CLAIM FOR RELIEF
### (Breach of Warranty – Against Knoedler and Freedman)

376.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 375 of this Complaint as if fully set forth herein.

377.    Prior to and at the time of the sale, for the purposes of inducing Howard to consummate the transaction and as part of the basis of the bargain, Freedman and Knoedler represented to Howard expressly and unequivocally that: (1) the Work was created by Willem de Kooning in 1956-57; (2) the Work was owned by the son of a Swiss private collector who obtained the Work from de Kooning via David Herbert; (3) the Work came directly to Knoedler from an individual, whom Knoedler and Freedman knew personally; and (4) the Work was a "rare" and "distinctive' example of a de Kooning landscape and that it was of "impeccable" quality and provenance.

378.    These representations were communicated directly to Howard by Freedman.

379.    These representations were also communicated by Freedman to Frankfurt.

380.    These representations constitute express warranties under N.Y.U.C.C. § 2-313(1).

381.    In addition, the representations concerning authenticity and provenance in the invoice by defendants (who are art merchants) to Howard (who is not) constitute express warranties under § 13.01 of the New York Arts and Cultural Affairs Law.

382.    Howard, in agreeing to consummate the transaction, relied on Defendants' express warranties concerning the Work's authenticity, provenance and rarity. Howard would not have purchased the Work at any price had he been aware that defendants' warranties were false.

383.    The doctrine of equitable tolling applies to defendants' breach of warranty as Freedman and Knoedler concealed this information from Howard such that Howard was unable, despite due diligence, to bring his claims in a timely manner.

384.    Freedman and Knoedler would not provide Howard with information as to the purported Swiss collector's identity, his son's identity or other material documentation.

385.    Freedman and Knoedler had knowledge that IFAR had refused to authenticate a different piece, the Green Pollock, which had also been sourced from Rosales.

386.    There are no records in Herbert's archives that would indicate that he made "back-door" sales of the Work or other de Kooning works.

387.    Freedman and Knoedler had knowledge that there was no documentation that would support their representations that the Work had been painted by de Kooning.

388.    The doctrine of equitable tolling also applies because the actions and inactions of Freedman and Knoedler (including the failures to make disclosures as set forth in this Complaint) induced Howard to refrain from commencing a timely action.

51

389.    Accordingly, Howard has been damaged as a result of defendants' breaches of their express warranties.

### EIGHTH CLAIM FOR RELIEF
### (Unilateral Mistake – Plaintiff Directly Against Knoedler)

390.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 389 of this Complaint as if fully set forth herein.

391.    A unilateral mistake existed by virtue of Howard's mistaken belief that: (1) the Work was owned by a Swiss private collector who obtained the Work through David Herbert and passed title "by descent" to his son; (2) there were no questions about the Work's authenticity; and (3) the Work was fully marketable.

392.    Howard purchased the Work without any knowledge of these mistakes.

393.    Howard would not have been able to ascertain the truth concerning his mistaken belief at the time of the sale of the Work because such information was exclusively in the defendants' possession.

394.    Howard exercised reasonable diligence in investigating the Work prior to its purchase.

395.    Howard fully performed all of his obligations under the purchase agreement.

396.    Howard has no adequate remedy at law. As a result, Howard is entitled to rescind the purchase.

### NINTH CLAIM FOR RELIEF
### (Unilateral Mistake – Plaintiff as Assignee Against Knoedler)
### (In the Alternative)

397.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 396 of this Complaint as if fully set forth herein.

398.    A unilateral mistake existed by virtue of Frankfurt's mistaken belief that: (1) the Work was owned by a Swiss private collector who obtained the Work through David Herbert and passed title "by descent" to his son; (2) there were no questions about the Work's authenticity; and (3) the Work was fully marketable.

399.    Frankfurt purchased the Work without any knowledge of these mistakes.

400.    Frankfurt would not have been able to ascertain the truth concerning his mistaken belief at the time of the sale of the Work because such information was exclusively in the defendants' possession.

401.    Frankfurt exercised reasonable diligence in investigating the Work prior to its purchase.

402.    Frankfurt fully performed all of his obligations under the purchase agreement.

403.    Frankfurt has no adequate remedy at law. As a result, Frankfurt is entitled to rescind the purchase.

404.    Howard, as Frankfurt's assignee, is entitled to assert this claim against Knoedler.

## TENTH CLAIM FOR RELIEF
### (Mutual Mistake – Plaintiff Directly Against Knoedler)
### (In the Alternative)

405.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 404 of this Complaint as if fully set forth herein, except that he pleads this claim in the alternative to his allegation that Knoedler knowingly defrauded him.

406.    A mutual mistake existed by virtue of both Howard's and Knoedler's mutual mistake that the Work was an authentic de Kooning. Howard never would have paid Knoedler

$3.5 million—and Knoedler, in good conscience, never would or could have accepted $3.5 million—for a painting that the parties did not believe to be an authentic de Kooning.

407.    Howard agreed to and did purchase the Work without any knowledge of these mistakes.

408.    Howard fully performed all of his obligations under the purchase agreement.

409.    Howard has no adequate remedy at law. As a result, Howard is entitled to rescind the purchase.

**ELEVENTH CLAIM FOR RELIEF**
**(Mutual Mistake – Plaintiff as Assignee Against Knoedler)**
**(In the Alternative)**

410.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 409 of this Complaint as if fully set forth herein, except that he pleads this claim in the alternative to his allegation that Knoedler knowingly defrauded him.

411.    A mutual mistake existed by virtue of both Frankfurt's and Knoedler's mutual mistake that the Work was an authentic de Kooning. Frankfurt never would have paid Knoedler $3.5 million—and Knoedler, in good conscience, never would or could have accepted $3.5 million—for a painting that the parties did not believe to be an authentic de Kooning.

412.    Frankfurt agreed to and did purchase the Work without any knowledge of these mistakes.

413.    Frankfurt fully performed all of his obligations under the purchase agreement.

414.    Frankfurt has no adequate remedy at law. As a result, Frankfurt is entitled to rescind the purchase.

415.    Howard, as Frankfurt's assignee, is entitled to assert this claim against Knoedler.

**WHEREFORE**, plaintiff demands judgment as follows:

   a.   Awarding Plaintiff compensatory damages in an amount to be determined at trial, but no less than $3.5 million, plus interest;

   b.   Awarding Plaintiff treble damages under 18 U.S.C. § 1962(c) and (d), on Plaintiff's RICO claims;

   c.   Awarding Plaintiff reasonable attorneys' fees under 18 U.S.C. § 1962(c) and (d), on Plaintiff's RICO claims;

   d.   Awarding Plaintiff punitive damages in an amount to be determined at trial, but no less than $1 million by virtue of defendants' willful and intentional tortious misconduct;

   e.   Awarding Plaintiff the costs and disbursements of this action; and

   f.   Such other or further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Howard demands a trial by jury.

Dated:   New York, New York
       July 6, 2012

                              **LYNN | CAHILL** LLP

                              John R. Cahill
                              Ronald W. Adelman
                              58 West 40th Street
                              New York, New York 10018
                              (212) 719-4400

                              *Attorneys for Plaintiff*
                              *John D. Howard*

6/11/07

Mrs. Glafira Rosales
21 Elm Court
Sands Point, NY 11050

KNOEDLER & COMPANY
19 East 70th Street
New York, NY 10021

We report the purchase of the following artwork:

Willem de Kooning
Untitled
ca. 1956-57
Oil on paper mounted to masonite
20 1/2 x 29 inches
CA 26933
A 12537

Please find enclosed Knoedler check #9271 dated June 11, 2007 in the amount of $30,000.00.
Additionally, [illegible] [illegible]
Total payment $750,000.00                                                    $   750,000.00

In consideration of the total sum of $750,000.00, the undersigned hereby transfers and sells to
Knoedler & Company the artwork described above.

The undersigned warrants that the title to this artwork
is rightfully conveyed and that it is authentic.
The undersigned further agrees to defend this sale
against any contrary claim.

PLEASE SIGN & RETURN ONE COPY

FREEDMAN-HC-0001117