UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JOHN D. HOWARD, individually and as assignee of Jaime Frankfurt LLC, | ECF CASE |
| *Plaintiff*, | 12-CV-5263 (PGG) (HBP) |
| -against- | **DECLARATION OF** |
| ANN FREEDMAN, GLAFIRA ROSALES, KNOEDLER GALLERY, LLC, d/b/a KNOEDLER & COMPANY, MICHAEL HAMMER, JOSE CARLOS BERGANTINOS DIAZ, and JAIME ANDRADE, | **RONALD W. ADELMAN** |
| *Defendants.* | |

RONALD W. ADELMAN declares under penalty of perjury:

I am counsel at Cahill Partners LLP, attorney for Plaintiff John Howard ("Howard") in the above captioned matter. I make this declaration in connection with Howard's motion, pursuant to Fed. R. Civ. P. 37, to impose sanctions on defendants Michael Hammer and Knoedler Gallery, LLC.

Annexed hereto are true and correct copies of the following:

1.     Exhibit A is a letter from Frank Del Deo to Michael Hammer, dated October 20, 2009, produced by Knoedler Gallery with the bates number KG-00002280.

2.     Exhibit B consists of the relevant excerpts from the transcript of the Deposition of Frank Del Deo, taken on May 10, 2013.

3.     Exhibit C consists of the relevant excerpts from the transcript of the Deposition of Michael Hammer, taken on May 8, 2013.

4.     Exhibit D is the Page 1 of the privilege log of Knoedler Gallery, LLC, dated March 22, 2013.

5.     Exhibit E is a letter from Ronald W. Adelman to Charles Schmerler, dated September 19, 2012.

6.     Exhibit F is an excerpt from the Transcript of a Conference before Judge Paul G. Gardephe, dated December 6, 2012.

7.     Exhibit G is a letter from John Cahill to Charles Schmerler et al., dated December 18, 2012.

8.     Exhibit H is a letter from Ann Freedman to Jay Shidler, dated March 23, 2006.

9.     Exhibit I is a letter from Howard Nagelberg to Michael Hammer, dated December 19, 2011.

10.     Exhibit J is a letter from Andrius Kontrimas to Howard Nagelberg, dated January 5, 2012.

11.     Exhibit K consists of relevant excerpts from the transcript of the Deposition of Howard Shaw, taken on April 29, 2013.

12.     Exhibit L consists of relevant excerpts from the transcript of the Deposition of Ann Freedman, taken on May 6, 2013.


Dated: August 30, 2013
       New York, New York

                                          _____
                                          Ronald W. Adelman

2

# Exhibit A

October 20, 2009

Mr. Michael A. Hammer
The Armand Hammer Foundation
9510 Jefferson Boulevard
Culver City, CA  90232                        *via FEDEX*

Dear Michael,

As you requested, I am sending to you herewith an updated list of Knoedler-owned inventory, with columns including **Cost** and **Retail** and **Date Purchased.**

Please note that, with respect to the "Rosales" and "Masaccio" pictures, we have changed their designation, for the time being, to NFS (not for sale).

With all best,


Frank Del Deo
Director

# Exhibit B

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
INDEX NO. 12 CV 5263
-------------------------------------------x
JOHN D. HOWARD, individually and as assignee of
Jaime Frankfurt, LLC,

    Plaintiff,

vs.

ANN FREEDMAN, GLAFIRA ROSALES, KNOEDLER
GALLERY, LLC, d/b/a KNOEDLER & COMPANY, MICHAEL
HAMMER, 8-31 HOLDINGS, INC., JOSE CARLOS
BERGANTINOS DIAZ, and JAIME R. ANDRADE,
    Defendants.
-------------------------------------------x
INDEX NO. 12 Civ 2313
DOMENICO DE SOLE and ELEANORE DE SOLE,
individually and as assignees of LAURA DE SOLE,

    Plaintiffs,

vs.

KNOEDLER GALLERY, LLC D/B/A KNOEDLER & COMPANY,
ANN FREEDMAN, GLAFIRA ROSALES, JOSE CARLOS
BERGANTINOS DIAZ, MICHAEL HAMMER, and JAIME
ANDRADE,

    Defendants.
-------------------------------------------x
DEPOSITION OF FRANK DEL DEO
Friday, May 10, 2013

HUDSON REPORTING & VIDEO       1-800-310-1769

Page 2

```
 1          Deposition of FRANK DEL DEO taken in the
 2   above-entitled matter before Mark Iuzzolino, a
 3   Certified Shorthand Reporter (License No. X101103),
 4   taken at the offices of CAHILL PARTNERS, LLP, 58
 5   West 40th Street, 2nd Floor, New York, New York, on
 6   Friday, May 10, 2013, commencing at
 7   10:07 a.m.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   A P P E A R A N C E S :
 2
 3        CAHILL PARTNERS, LLP
 4        58 West 40th Street, 2nd Floor
 5        New York, New York 10018
 6        212-719-4400
 7        BY: JOHN R. CAHILL, ESQ.
 8        Attorneys for the Plaintiff
 9
10        FULBRIGHT & JAWORSKI LLP
11        666 Fifth Avenue
12        New York, New York 10103
13        212-318-3326
14        BY: INDIA DECARMINE, ESQ.
15        Attorneys for the Defendants Knoedler Gallery,
16        Michael Hammer, 8-31 Holdings, Inc.
17
18        OUTTEN & GOLDEN LLP
19        3 Park Avenue
20        New York, New York 10016
21        212-245-1000
22        BY: LEWIS M. STEEL, ESQ.
23        Attorneys for the witness, Frank Del Deo
24
25
```

Page 4

```
 1
 2   A P P E A R A N C E S : (CONT.)
 3
 4        BOIES, SCHILLER & FLEXNER, LLP
 5        10 North Pearl Street
 6        Albany, New York 12207
 7        518-694-4222
 8        BY: PAUL B. MASLO, ESQ.
 9        Attorneys for the Defendant Ann Friedman
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1         TABLE OF CONTENTS
2
3    WITNESS      EXAMINED BY        PAGE
4    FRANK DEL DEO
5         Mr. Cahill          6
6         Mr. Maslo          180
7
8         E X H I B I T S
9
10   NUMBER      DESCRIPTION        PAGE
11   P-322A   Letter from Frank Del Deo    94
12        dated April 21, 2004
13   P-323A   Letter dated September 15,   115
14        2005
15   P-324A   Collection of documents      118
16   P-325A   Certification dated January  147
17        5, 1994
18   P-326A   Log of calls and inquiries   168
19        with the top date of July
20        21, 2011
21
22        MARKED COLLOQUY
23   PAGE        LINE
24   17       4
25

Page 6

1         FRANK DEL DEO
2    Having been first duly sworn, was examined and
3    testified as follows:
4
5    EXAMINATION
6    BY MR. CAHILL:
7         Q. Good morning, Mr. Del Deo. My name
8    is John Cahill, and I'm an attorney with the
9    firm of Cahill Partners, LLP, which represents
10   a gentleman named John Howard. And Mr. Howard
11   has filed a lawsuit against Ann Freedman,
12   Knoedler Gallery, and a number of other folks.
13   And I'm going to be asking you some questions
14   in connection with that lawsuit that will also
15   be usable in a case that's entitled De Sole
16   versus Knoedler and Freedman and some other
17   people.
18        When I ask you the questions, of
19   course, I'm going to be looking for answers.
20   You may hear an objection from your counsel or
21   from the other counsel. It can be
22   disconcerting. And what they're trying to do
23   is tell me that there's something maybe wrong
24   with the question or something else. Unless
25   your attorney asks you to -- instructs you not

Page 7

1    to answer, which he may do, in which case you
2    should listen to him, I'd appreciate it if
3    you'd answer the question. And do so verbally
4    because the court reporter needs to get
5    something on the record. We're not taking a
6    video today, so he needs to hear it and -- you
7    know, that will be helpful.
8         This is not an endurance contest.
9    You may find it tiring to answer questions.
10   And if at any point you want to take a break,
11   feel free to say, "I'd like to take a break."
12   The only thing I'd ask is that you do that
13   after you answer a question, not during a
14   question. The exception, which your attorney
15   will tell you, if you have some question about
16   something privileged or something like that,
17   then we'll do that.
18        Have you taken any medication, or is
19   there anything else we should know that would
20   keep you from testifying accurately and
21   honestly today?
22        A. No, sir.
23        Q. Did you -- have you ever been deposed
24   before?
25        A. No, sir.

Page 8

1         Q. Have you testified before?
2         A. Yes.
3         Q. And when was that?
4         A. In December of 2011.
5         Q. We may have seen each other there.
6         Was that in the Lagrange hearing?
7         A. That's correct.
8         Q. Before your deposition today -- and
9    don't tell me what you said -- did you spend
10   any time speaking with your attorney?
11        A. Yes.
12        Q. Did you spend any time speaking with
13   attorneys for any of the other parties in the
14   Howard case or the De Sole case?
15        A. No.
16        Q. Is anyone paying the legal fees of
17   your attorney?
18        MR. STEEL: Objection. I instruct
19   him not to answer. You're asking him an
20   attorney/client privileged matter.
21        MR. CAHILL: I don't think that's
22   privileged, but, of course, you know,
23   you're entitled to give your instruction.
24   Would it make a difference to you if I
25   phrase the question this way: Are any of

Page 9

1  the parties in the Howard/De Sole case
2  paying for your attorney?
3       MR. STEEL: Same objection.
4       MR. CAHILL: I do think there's law
5  to the contrary, but, again, I'm not going
6  to spend the time to do it now. We may
7  have to come back to that. I reserve the
8  right for that.
9  BY MR. CAHILL:
10      Q.  I can't remember if I asked you --
11  and if I did, I apologize -- whether you spent
12  any time with the attorneys for any of the
13  other parties in this case.
14      A.  You did ask me.
15      Q.  Yes. And you said no?
16      A.  I did.
17      Q.  I apologize for that.
18          Did you ever work for a gallery, an
19  art gallery during your career?
20      A.  Yes.
21      Q.  And have you worked for more than one
22  art gallery?
23      A.  I have.
24      Q.  What art galleries have you worked
25  for?

Page 10

1       A.  I worked for Knoedler & Company, I
2  have worked for Hirschl & Adler Modern, and I
3  have worked for Barbara Mathes Gallery, and I
4  have worked for Lee Witkin, Witkin Gallery.
5       Q.  And when did you begin working at the
6  Knoedler Gallery?
7       A.  In November of 1999.
8       Q.  When did you stop working at the
9  Knoedler Gallery?
10      A.  In November of 2011.
11      Q.  Do you remember the date in 2011 that
12  you stopped working at the Knoedler Gallery?
13      A.  It was late in the month, but, no.
14      Q.  At the time that you began at the
15  Knoedler Gallery, what was your position?
16      A.  I was the associate director.
17      Q.  At the time you finished, what was --
18  at the time you stopped working at the Knoedler
19  Gallery, what was your position?
20      A.  I was the president and director.
21      Q.  In what year did you become the
22  president and director?
23      A.  In 2009.
24      Q.  Do you remember the month?
25      A.  I believe it was September or

Page 11

1  October.
2       Q.  Did anyone occupy the role of
3  president before you became president of
4  Knoedler?
5       A.  Yes.
6       Q.  And who was that?
7       A.  Ann Freedman.
8       Q.  Did anyone occupy the role of
9  director before you became director?
10      A.  Yes.
11      Q.  And who was that?
12      A.  That was Ann Freedman.
13      Q.  And was 2008 the last full year in
14  which Ann Freedman was the president and
15  director?
16      A.  That would be correct.
17      Q.  Do you know what Ann Freedman's
18  compensation was in 2008?
19      A.  I do not.
20      Q.  Do you have any idea?
21       MR. STEEL: Objection.
22       MS. DeCARMINE: Objection.
23       MR. MASLO: Objection.
24  BY MR. CAHILL:
25      Q.  Do you know if Ms. Freedman made more

Page 12

1  than a million dollars in 2008?
2       A.  I do not know.
3       Q.  In your last year -- was your last
4  full year of working at Knoedler 2010?
5       A.  Yes.
6       Q.  What was your compensation from
7  Knoedler in 2010?
8       A.  My base salary was $240,000.
9       Q.  Did you receive a bonus in 2010?
10      A.  240 or 250. No, I did not.
11      Q.  Did you have any bonus -- did you
12  have any agreement with Knoedler about bonus
13  compensation?
14      A.  Not at that time.
15      Q.  Had you ever, when working with
16  Knoedler, have any agreement concerning bonus
17  comp?
18      A.  No.
19      Q.  Did you ever have any profit share?
20      A.  No.
21      Q.  Do you know if Ms. Freedman had any
22  profit share?
23      A.  It was my understanding that she did.
24      Q.  Do you know what Ms. Freedman's
25  profit share was?

Page 13

1       A.  I do not.
2       Q.  In 2010 did you believe that your
3   compensation at Knoedler was consistent with
4   the market for art gallery directors in 2010?
5       MR. STEEL: Objection.
6       MS. DeCARMINE: Objection.
7       MR. STEEL: You may answer.  My
8   objection is noted on the record.
9       A.  Okay.  Could I ask you to repeat the
10  question?
11      Q.  Sure.  In 2010 do you believe that
12  your compensation was consistent for the -- was
13  consistent with the market for art gallery
14  directors in 2010?
15      A.  My compensation?
16      Q.  Yes.
17      A.  Yes, more or less.
18      Q.  Did you feel underpaid?
19      A.  Maybe somewhat.
20      Q.  Can you give me some sense of the
21  magnitude by which you felt underpaid?
22      A.  Maybe 20 percent of, you know, what
23  my base salary was, to that magnitude.
24      Q.  Did your duties in 2010 as president
25  and director differ in any way from

Page 14

1   Ms. Freedman's duties in 2008 as president and
2   director?
3       MR. STEEL: Objection.
4       MS. DeCARMINE: Objection.
5       MR. MASLO: Objection.
6       A.  Am I to answer the question?
7       Q.  Yes, if there's an objection, unless
8   you hear an instruction not to answer.
9       A.  Well, my duties -- I'm sorry.  Would
10  you --
11      Q.  Did your duties in 2010 as president
12  and director of Knoedler differ in any way from
13  Ms. Freedman's duties as president and director
14  of Knoedler?
15      MR. STEEL: Again, our objections are
16  noted on the record.
17      A.  I don't really know.
18      Q.  You don't know?  All right.
19      Who was your employer when you joined
20  the Knoedler Gallery in November of 1999?
21      A.  Knoedler & Company was my employer.
22      Q.  And did there come a time when that
23  changed?
24      A.  Not to my knowledge.
25      Q.  When you -- did you receive a salary

Page 15

1   in 1999 when you joined Knoedler?
2       A.  I did.
3       Q.  And who paid that salary?
4       A.  The company.
5       Q.  Do you know what the name of the
6   company was?
7       A.  It was either the gallery's name or
8   another entity.  I don't recall.
9       Q.  Were you ever paid by a company
10  called "8-31 Holdings"?
11      A.  Yes.
12      Q.  And when did that begin?
13      A.  I don't recall.
14      Q.  Did you ever do any work for
15  8-31 Holdings?
16      A.  I don't know what you mean by that.
17      Q.  Well, did you -- do you ever perform
18  any services as an employee for 8-31 Holdings?
19      MR. STEEL: Objection.
20      A.  If 8-31 Holdings was paying me, then
21  I was presumably working for them.
22      Q.  Do you know what the business of
23  8-31 --
24      MS. DeCARMINE: I'm going to move to
25  strike that answer as nonresponsive.

Page 16

1       Q.  Do you know what the business of
2   8-31 Holdings was, if any?
3       A.  It was the company that owned the
4   gallery as well as another gallery.
5       Q.  And what was the other gallery?
6       A.  Hammer Galleries.
7       Q.  Do you recall anything that you did
8   for 8-31 Holdings as distinct from the gallery?
9       A.  No.
10      Q.  Were you fired from Knoedler?
11      A.  No.
12      Q.  Did you resign from Knoedler?
13      A.  I did.
14      Q.  And why did you resign?
15      A.  The gallery was facing eminent
16  closure, and I wanted to get on with my life.
17      Q.  When did you come to believe that the
18  gallery was facing eminent closure?
19      A.  When I was told by the gallery's
20  attorney.
21      MS. DeCARMINE: I'm going to caution
22  that you not go any further with his
23  conversations with the gallery's
24  attorneys.
25      Q.  When did the gallery's attorney tell

Page 17

1   you that the gallery was closing?
2           MS. DeCARMINE: Again, I'm going to
3   instruct him not to answer.
4           MR. CAHILL: Again, I don't think
5   that's privileged, but I can't -- I can't
6   stop. We'll just mark that for the
7   record. It won't go on.
8   BY MR. CAHILL:
9       Q. Who was the gallery's attorney at the
10  time you resigned from the gallery?
11      A. Mr. Andrius Kontrimas.
12      Q. Had you ever met Mr. Kontrimas at the
13  time that you resigned from the gallery?
14      A. No.
15      Q. How long between the time that you
16  learned that the gallery was facing imminent
17  closure -- let me withdraw that.
18          How much time passed between the time
19  you learned that the gallery was facing
20  imminent closure and your resignation?
21          MS. DeCARMINE: Objection.
22      A. It was a matter of days.
23      Q. Do you know how many days?
24      A. No.
25      Q. Did you discuss your resignation with

Page 18

1   anyone at Knoedler other than an attorney?
2       A. Yes.
3       Q. With whom did you discuss your
4   resignation at Knoedler other than an attorney?
5       A. My associate director, Benjamin
6   Barzune.
7       Q. When did you have a discussion with
8   Mr. Barzune about your resignation?
9       A. Several days before I submitted my
10  resignation.
11      Q. Where did that discussion take place?
12      A. I don't recall.
13      Q. And what was the substance of your
14  conversation with Mr. Barzune before your
15  resignation?
16          What was your discussion -- I think
17  you testified you had a discussion with
18  Mr. Barzune about your resignation several days
19  before you resigned.
20      A. Yes.
21      Q. My question is: What was the
22  substance of the discussion with Mr. Barzune
23  about that?
24      A. That there was plans to close the
25  gallery abruptly and that we had no intention

Page 19

1   of -- I had no intention of staying on during
2   that time and that I was resigning.
3       Q. Do you recall anything Mr. Barzune
4   said?
5       A. That he, too, was going to resign.
6       Q. Did you tell Mr. Barzune why the
7   gallery was going to close abruptly?
8           MR. MASLO: Objection.
9           MS. DeCARMINE: Object to the form.
10      A. That it was a decision that ...
11          MS. DeCARMINE: To the extent that
12  any of it is what was communicated to you
13  by Knoedler's counsel, I instruct you not
14  to answer.
15          THE WITNESS: Okay.
16  BY MR. CAHILL:
17      Q. What did you tell -- did you tell
18  Mr. Barzune anything about why the gallery was
19  closing?
20          MR. STEEL: Again, the instruction is
21  that, if you got the information from
22  counsel, that's privileged.
23          THE WITNESS: And that information
24  did come from counsel.
25          MR. CAHILL: So you're instructing

Page 20

1   the witness not to answer a conversation
2   that he had with an employee at Knoedler
3   Gallery?
4           MS. DeCARMINE: Yes, about a
5   conversation that he had with an attorney
6   at Knoedler Gallery, yes.
7   BY MR. CAHILL:
8       Q. I'm not asking you to tell me any --
9   did you -- I'm not asking you to tell me
10  anything about your conversation with the
11  attorney. I'm asking you to tell me what you
12  told Mr. Barzune.
13          MS. DeCARMINE: I'm repeating the
14  instruction. What he told Mr. Barzune
15  is -- was learned from the attorney and
16  was in the context of his privileged
17  conversation with the attorney. And
18  Mr. Barzune is also still employed by
19  Knoedler. I am instructing him not to
20  answer that.
21  BY MR. CAHILL:
22      Q. Did you tell Mr. Barzune anything
23  about your conversation with Mr. Kontrimas?
24      A. Yes.
25      Q. When you say that the gallery planned

Page 21

1  to close abruptly, what did you mean by the
2  word "abruptly"?
3     A.  Prematurely, before it was scheduled
4  to cease operation.
5     Q.  And were there plans at the time that
6  you learned that the gallery was to close that
7  the gallery was to cease operations at a later
8  date?
9     A.  It's my understanding that we were
10 ceasing operations at a later date.
11    Q.  What date did you understand that the
12 gallery in --
13    A.  February of '12, or January.
14    Q.  And when did you learn that the
15 gallery would cease operations in February of
16 2012?
17       MS. DeCARMINE:  Again, I will caution
18    you.  If it's in the context of an
19    attorney/client communication, I will
20    caution you not to answer.
21    Q.  I'm not asking you to tell me
22 anything about an attorney/client
23 communication.
24       I'm just asking you to tell me when
25 you learned that the gallery was scheduled to

Page 22

1  close in February of 2012.
2     A.  It was sometime in the summer months
3  of 2011.
4     Q.  Do you remember which month in the
5  summer?
6     A.  Middle summer.  I have no idea.
7     Q.  And how did you learn that the
8  gallery was scheduled to close in February of
9  2012?
10       MS. DeCARMINE:  Same caution.
11    A.  I learned that through a conversation
12 with Mr. Hammer.
13    Q.  And where did that conversation take
14 place?
15    A.  On the telephone.
16    Q.  What was the substance of that
17 conversation you had with Mr. Hammer about the
18 gallery's scheduled closing in February 2012?
19    A.  That the premises that we occupied
20 was sold, and we -- our lease was to terminate
21 in February of 2012.
22    Q.  Anything else you recall about that
23 conversation?
24    A.  No.
25    Q.  Did you discuss whether you would be

Page 23

1  terminated in February of 2012?
2     A.  No.
3     Q.  Did you understand that you would be
4  terminated when you had that conversation in
5  February of 2012 when the gallery ceased
6  operations?
7     A.  No, I didn't understand that.
8     Q.  What employment with Knoedler did you
9  think you would have?
10    A.  I wasn't certain what the employment
11 would be.
12    Q.  Did you have any discussions with
13 Mr. Hammer about any employment you would have
14 after February of 2012 during that
15 conversation?
16    A.  Yes.
17    Q.  What was the discussion?
18    A.  That he might wish me to stay on to
19 wind down the operation.
20    Q.  And did you say anything about your
21 willingness to stay on to wind down the
22 operation?
23    A.  I think I was considering it.
24    Q.  When you were told that the gallery
25 was closing abruptly, why did you resign

Page 24

1  instead of staying on to wind down the
2  gallery's operations?
3        MS. DeCARMINE:  Objection.
4     A.  The gallery was facing a lawsuit, and
5  I was concerned about the -- any negative press
6  that might affect me personally.
7     Q.  And what gave you concerns that the
8  press might affect you personally?
9     A.  Because I'm an employee of the
10 company.
11    Q.  Did you have any discussions with
12 Mr. Hammer about your reasons for resigning in
13 November of 2011?
14    A.  I did.
15    Q.  And what was the substance of that
16 communication?  Was there more than one
17 communication with Mr. Hammer about the reasons
18 you resigned?
19       MR. STEEL:  Which question are you
20    asking?
21       MR. CAHILL:  My question is:  Was
22    there more than one communication with
23    Mr. Hammer about the reasons for his
24    resignation in November of 2011?
25       MS. DeCARMINE:  And I would caution

1    that if these communications were also
2    with lawyers present, that you should not
3    answer.
4        A.  Those communications with Mr. Hammer
5    were not with lawyers present. I had one
6    telephone conversation with him, and I
7    submitted a written resignation.
8        Q.  Where did the telephone conversation
9    fall in relation to the written communication?
10   Was it before or after?
11       A.  Prior, before.
12       Q.  Was it on the same day as the written
13   communication?
14       A.  It was.
15       Q.  What was the substance of your
16   telephone communication with Mr. Hammer?
17       A.  That I felt it was in my best
18   interest to seek other employment opportunities
19   and to get on with my life.
20       Q.  Do you recall anything else you said
21   to Mr. Hammer?
22       A.  That I wished him well. And that was
23   about it.
24       Q.  Do you recall anything that
25   Mr. Hammer said to you?

1        A.  He expressed his understanding and
2    he, too, wished me well.
3        Q.  Was your desire to seek other
4    employment opportunities and get on with your
5    life the only reasons you gave Mr. Hammer for
6    your decision to resign?
7        A.  Yes.
8        Q.  What else did you tell him were
9    reasons that you were resigning?
10       A.  I'm sorry. I misunderstood your
11   question. You said -- can you repeat your
12   question, how you stated it?
13       Q.  My question was: Was your desire to
14   seek other employment opportunities and get on
15   with your life the only reasons you gave
16   Mr. Hammer for your decision?
17       A.  And I said: Yes, they were the only
18   reasons.
19       Q.  Okay. Did you tell Mr. Hammer that
20   you -- your ability to wind down the gallery
21   would be compromised in any way?
22       A.  I did.
23       Q.  And why was your ability to wind down
24   the gallery compromised at the time of your
25   resignation?

1        A.  Because of the pending litigation.
2        Q.  Would the pending litigation
3    compromise you in particular or just anyone who
4    was winding down the gallery?
5            MR. MASLO:  Objection.
6            MS. DeCARMINE:  Objection.
7        A.  At that point I was concerned only
8    with myself.
9        Q.  Did you speak with anyone else
10   besides Mr. Hammer and Mr. Barzune about your
11   decision to resign?
12           MR. STEEL:  Except counsel, I assume?
13       Q.  Let me just clarify.
14           Did you speak with counsel about your
15   decision to resign?
16           MS. DeCARMINE:  Objection. And don't
17   answer that to the extent that you -- I'm
18   going to instruct him not to answer it.
19       Q.  When you heard from Mr. Kontrimas
20   that the gallery was going to close abruptly,
21   did you say anything to Mr. Kontrimas?
22           MS. DeCARMINE:  I'm going to object
23   to that. That came out. And I really
24   should move to strike his answer because
25   it was privileged. But because there was

1    no real warning that he was going to come
2    out with something that was privileged, to
3    continue to question on that line of
4    questioning is improper. Do not answer.
5            MR. CAHILL:  The statement that the
6    gallery is going to close abruptly is not
7    a statement -- is not a privileged
8    statement. It's a statement of fact.
9            MS. DeCARMINE:  Attorney/client is
10   also context. It's not just that
11   something is out there as an independent
12   fact out in the universe. There's a
13   context in which your client communicates.
14   That was in the context of an
15   attorney/client communication.
16           MR. CAHILL:  We disagree about that.
17       Q.  So the last question was ...
18           MR. CAHILL:  So there's an
19   instruction not to answer that?
20           MS. DeCARMINE:  There is. That line
21   of questioning should be left.
22           MR. CAHILL:  I don't agree, but I
23   can't --
24           MS. DeCARMINE:  I understand we
25   disagree.

Page 33

1      Q.  And what was his position?
2      A.  I don't know what his official
3  position was, but ...
4      Q.  What understanding did you have of
5  Mr. Lynch's position at Knoedler, if any?
6      A.  I don't know that I had an
7  understanding other than he was overseeing the
8  wind-down of the operation.
9      Q.  Did you actually sell any works of
10 art in Knoedler's that you were introduced to
11 at Knoedler?
12     A.  Yes.
13     Q.  Did you reach an agreement on the
14 price of the works of art that were sold?
15     A.  Naturally.
16     Q.  With whom at Knoedler did you reach
17 an agreement?
18     A.  With Mr. Lynch.
19     Q.  And do you know if Mr. Lynch had
20 discussions with anyone else at Knoedler about
21 the prices of works that you were dealing with?
22     A.  No, I don't.
23     Q.  How many works of art from Knoedler
24 did you sell after you left Knoedler?
25     A.  I remember four.

Page 34

1      Q.  Can you give me an estimate of the
2  total value?
3      A.  Yeah.  I would say it was upwards
4  around a million three, $1,300,000.
5      Q.  Were you compensated in connection
6  with any of those sales?
7      A.  Yes.
8      Q.  And who compensated you?
9      A.  The purchaser.
10     Q.  And was the compensation in the form
11 of a commission?
12     A.  Correct.
13     Q.  Was there more than one purchaser?
14     A.  Yes.
15     Q.  Did the commissions vary by
16 purchasers?
17     A.  Yes.
18     Q.  Can you give me the range of the
19 commissions?
20     A.  In terms of value or --
21     Q.  In terms of percentage.
22     A.  In terms of percentage?  Yes.  10 to
23 15 percent, I would say.
24     Q.  Did you ever talk with Mr. Hammer
25 about the David Herbert pictures?

Page 35

1      A.  Yes.
2      Q.  What did you understand the David
3  Herbert pictures to be?
4      A.  Again, I don't know that I have an
5  understanding of what the David Herbert
6  pictures were, other than he was a dealer, a
7  private dealer and a gallerist of some note.
8  And works came through -- either through his
9  estate or through his hands.
10     Q.  When did you first hear of David
11 Herbert?
12     A.  I don't -- I don't recall.  I don't
13 recall.
14     Q.  Now, do you recall whether it was
15 before or after you joined Knoedler?
16     A.  It was certainly after I joined
17 Knoedler.
18     Q.  And when did you first discuss David
19 Herbert pictures with Mr. Hammer?
20     A.  In 2009.
21     Q.  And what was your discussion about --
22 at the time that you first discussed the David
23 Herbert pictures with Mr. Hammer in 2009, did
24 you have any understanding of whether
25 Mr. Hammer had ever heard of David Herbert

Page 36

1  before?
2          MS. DeCARMINE:  I'm going to caution
3      the witness:  If this was in the context
4      of an attorney meeting, don't answer.
5      A.  That conversation was with an
6  attorney.
7      Q.  And do you recall the month in 2009?
8      A.  Again, it was the summer, but I do
9  not recall the month.
10         MS. DeCARMINE:  I'm going to give a
11     continuing instruction that if the
12     witness, when he's asked a question about
13     a particular conversation, if there was an
14     attorney present, that he somehow will let
15     us know that, because it's very hard for
16     me to tell.  Up 'til now I thought you
17     were talking about a conversation simply
18     with Mr. Hammer.  And that's my look out,
19     but certainly I wasn't aware.
20     Q.  And who was the -- who was the
21 attorney who was present?
22     A.  It was an attorney with the firm of
23 Herrick something and something, as I recall.
24     Q.  Was that the first time you had -- do
25 you know the name of the attorney?

1       A.  I believe -- I think his name was
2   David Rosenfield, if I remember correctly.
3           MS. DeCARMINE:  That is as far as I'm
4   going to let him answer on this line.
5       Q.  Who else was present at the meeting
6   besides David Rosenfield?
7           MS. DeCARMINE:  I'm not going --
8           MR. CAHILL:  You're not going to let
9   me ask who else was present?
10          MS. DeCARMINE:  No.
11          MR. CAHILL:  And you're instructing
12  him not to answer that?
13          MS. DeCARMINE:  I'm instructing him
14  not to answer that.
15          MR. CAHILL:  I will just say that
16  there is -- I think there is no legal
17  basis for saying that identifying the
18  people at a meeting is a basis of an
19  instruction not to answer just because an
20  attorney was present.  But, again, we'll
21  agree to disagree.  But I do want to make
22  it clear that that is a question that I
23  will seek a ruling on.
24  BY MR. CAHILL:
25      Q.  If I represent to you that Herrick,

1   Feinstein signed a retainer agreement with
2   Knoedler in August of 2009, does that refresh
3   your recollection about when that meeting
4   occurred?
5           MR. STEEL:  Objection.
6           MS. DeCARMINE:  Objection.
7           MR. CAHILL:  Am I to answer?
8           MR. STEEL:  Yes.
9           MS. DeCARMINE:  You can answer just
10  when -- if it refreshes your recollection.
11      A.  It does.
12      Q.  When -- without telling me what was
13  said, when did the meeting occur?
14      A.  Again, you just said it was in August
15  of 2009.  Sometime in the summer of 2009 is
16  what I remember.
17      Q.  And prior to that meeting, have you
18  ever heard of the law firm of Herrick
19  something, the law firm with the name "Herrick"
20  before?
21      A.  No.
22      Q.  Do you know how -- withdraw that.
23          Do you know -- had you ever heard of
24  David Rosenfield before?
25      A.  No.

1       Q.  Do you know who introduced Knoedler
2   to the law firm of Herrick?
3           MS. DeCARMINE:  Objection.
4           MR. MASLO:  Objection.
5       A.  Yes.
6       Q.  And who was that?
7       A.  Howard Shaw.
8       Q.  Did you ever have any conversations
9   with Howard Shaw prior to Knoedler's retaining
10  Herrick about Herrick?
11          MS. DeCARMINE:  And I'm going to
12  caution:  To the extent any of those
13  conversations were in the context of the
14  hiring of the lawyers or to the extent
15  that any of those conversations were with
16  any other lawyers from Knoedler present,
17  not to answer.
18      A.  No.
19      Q.  And who is Howard Shaw?
20      A.  He is an employee of Hammer
21  Galleries.
22      Q.  Did you ever hear of a special
23  committee being formed at Knoedler?
24          MS. DeCARMINE:  If you heard of that
25  with attorneys present, I do not want you

1   to answer that.  It's privileged.
2       A.  No.
3       Q.  No, you've never heard of a special
4   committee at Knoedler?
5       A.  Correct.  No, I never heard of it.
6       Q.  Prior to the summer of 2009, did you
7   ever have any discussion with Michael Hammer
8   concerning David Herbert pictures?
9           MR. MASLO:  Objection.
10      A.  No.
11      Q.  Prior to the summer of 2009, did you
12  ever have a discussion with Michael Hammer
13  concerning the sales of any work of art?
14          MS. DeCARMINE:  Objection.
15      A.  No.
16      Q.  How much contact did you have with
17  Michael Hammer before the summer of 2009 during
18  the time you worked at Knoedler?
19      A.  Extremely minimal contact.
20      Q.  And what was the nature of your
21  contact with Michael Hammer before the summer
22  of 2009?
23      A.  I might see him in passing as he
24  visited the gallery, which he did very
25  infrequently.

Page 137

1     A. I don't know. I don't think so. I
2  think that's why you see them here as "NFS" or
3  not for sale.
4     Q. Where would you look in the Knoedler
5  Gallery records for sales of work by -- that
6  came in through Mr. Masaccio?
7     A. The same place you'd look for sales
8  of any work.
9     Q. And where is that?
10    A. In the database and in the files.
11    Q. Do you know if Knoedler sold any
12 works brought in by Mr. Masaccio to anyone?
13    A. I believe so.
14    Q. Do you know if Knoedler ever sought
15 out anyone who had bought a work brought in by
16 Mr. Masaccio to refund their money?
17        MS. DeCARMINE: Objection to form.
18    A. Do I know -- sorry?
19    Q. If Knoedler ever sought out anyone
20 who bought a work brought into Knoedler by
21 Mr. Masaccio to refund their money?
22    A. I don't know.
23    Q. Do you know if anyone at Knoedler
24 ever communicated your concerns about
25 Mr. Masaccio to anyone who had purchased a work

Page 138

1  brought in by Mr. Masaccio?
2        MS. DeCARMINE: Objection to form.
3     A. I don't know.
4     Q. Do you know if anyone ever -- if
5  Mr. Masaccio ever brought in a work attributed
6  to Mark Rothko?
7     A. I don't know.
8        MR. STEEL: It's one o'clock, and,
9  frankly, I would like a break.
10        MR. CAHILL: Okay.
11        (There is a luncheon recess
12        taken.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 139

1        AFTERNOON SESSION
2        MR. CAHILL: I distributed
3     Exhibit 161 to everyone just so everyone
4     has a copy of it.
5  BY MR. CAHILL:
6     Q. And while you have a copy of that, do
7  you recall seeing that work, the work of -- the
8  image of which is Exhibit 161?
9     A. No.
10    Q. No?
11        Referring you back to Plaintiff's
12 Exhibit 324, can you tell me --
13        MR. STEEL: 324A?
14        MR. CAHILL: 324A, yes. Thank you.
15    Q. Can you tell me which, if any, of
16 these were brought in by Mr. Masaccio and
17 which, if any, were brought in by Ms. Rosales?
18    A. Referring first to page 2 --
19    Q. Can you tell -- and if you don't
20 know, it's perfectly fine.
21    A. I'm going to circle back to page 1 if
22 you don't mind. I prefer to start on page 2.
23    Q. Oh, okay. That's fine.
24    A. So the works listed on page 2 are
25 works that, to my knowledge, came in from

Page 140

1  Ms. Rosales --
2     Q. All of them?
3     A. Yes.
4        -- and as well as the works on page
5  3. The works on page 1, it's not entirely
6  clear to me the source of these works.
7     Q. Let me see if I can show you --
8     A. I do not think they're Ms. Rosales'
9  supplied works, but I don't know.
10    Q. Let me show you what's previously
11 been marked as Plaintiff's Exhibit 311A and see
12 if that can refresh your recollection.
13    A. I'm sorry.
14    Q. 311A.
15        MR. STEEL: Okay, got it.
16    Q. And so, does anything in -- first of
17 all, did you write Plaintiff's 311A?
18    A. Yes, yes.
19    Q. And did you send it to Mr. Hammer?
20    A. Yes.
21    Q. And do you recall what was included
22 with -- what, if anything, was included with
23 your letter to Mr. Hammer?
24    A. I would just refer to what I stated
25 in the letter. There was a list, an inventory

Page 141

1   list.
2       Q.  And did you create that list?
3       A.  No.
4       Q.  Who created it?
5       A.  Someone at the gallery.  I don't
6   know.  One of the assistants, perhaps a
7   registrar -- I don't know.
8       Q.  And where at the gallery would that
9   list have been maintained while you were at the
10  gallery?
11      A.  I would imagine Melissa would
12  probably maintain it in that it was part of my
13  correspondence.
14      Q.  Do you have a file of your
15  correspondence?
16      A.  Melissa maintained a file of my
17  correspondence.
18      Q.  Was that paper -- a file of paper
19  copies or --
20      A.  I don't know.  I would imagine some
21  combination of paper and electronic file.
22      Q.  Were you aware where the paper files
23  were maintained?
24      A.  No.
25      Q.  Was there a filing cabinet?

Page 142

1       A.  There were filing cabinets.  I don't
2   know if it was in my office or by where she
3   sat.
4       Q.  And how about the electronic files of
5   your correspondence?  Where were they
6   maintained?
7       A.  Wherever one keeps electronic files.
8       Q.  You don't know?
9       A.  No.
10      Q.  Well, I can represent to you we don't
11  have the enclosures.  That's why I can't show
12  you that.  But I would like to ask you --
13  referring to the second paragraph, it says,
14  "Please, note that with respect to the 'Rosales
15  and Masaccio pictures,' we have changed their
16  designation for the time being to NFS, not for
17  sale."
18          Do you have any recollection of what
19  you're referring to as the "Rosales and
20  Masaccio pictures" on that list?
21      A.  Well, we're not looking at a list.
22  We're just looking at --
23      Q.  Yeah.
24      A.  So I can't refer to a -- I can't
25  really refer to them based on this.

Page 143

1       Q.  Do you know how many Rosales pictures
2   were on the list?
3       A.  I don't.
4       Q.  Do you know how many Masaccio
5   pictures were on the list?
6       A.  I don't.
7       Q.  And did you change the designation to
8   NFS?
9       A.  Not me personally, no.
10      Q.  But did you make the decision to
11  change the designation to NFS?
12      A.  I don't recall.  It might have been
13  in consultation with Mr. Hammer, which is what
14  this seems to refer to.
15      Q.  When you say, "We have changed their
16  designation" --
17      A.  We, the gallery.
18      Q.  Yes, okay.
19          Do you recall discussing this list
20  with Mr. Hammer?
21          MS. DeCARMINE:  I'll caution if there
22      is an attorney privilege --
23      A.  No.  I just recall sending it to him.
24  He would ask for a list, an inventory list from
25  time to time.

Page 144

1       Q.  How often did Mr. Hammer ask for an
2   inventory list?
3       A.  Occasionally.
4       Q.  If you can, can you put a time frame
5   on that?  Monthly?
6       A.  No.  Maybe a couple times a year.
7       Q.  Do you know why Mr. Hammer asked
8   for -- requested the updated list of
9   Knoedler-owned inventory at or about the time
10  you sent it to him in October of --
11      A.  I think so.
12      Q.  Do you know why he asked for that?
13      A.  I think so, yes.
14      Q.  Why is that?
15      A.  I think we were reviewing the pricing
16  of works and readjusting, reevaluating.
17      Q.  Did you have any discussions with
18  Mr. Hammer about the pricing of works?
19      A.  No.  I mean, he would leave that to
20  us.  It wasn't sort of his knowledge, but he
21  would ask for it from time to time.
22      Q.  Did you have any discussion with
23  Mr. Hammer about the Masaccio or Rosales works
24  in or about October of 2009?
25          MS. DeCARMINE:  Objection.

# Exhibit C

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

```
DOMENICO DE SOLE and           )
ELEANORE DE SOLE,              )
individually and as assignees )
of LAURA DE SOLE,             )
            Plaintiffs,       )
           -against-          ) 12 civ. 2313(PGG)
                              )
KNOEDLER GALLERY, LLC,        )
d/b/a KNOEDLER & COMPANY,     )
ANN FREEDMAN, GLAFIRA ROSALES,)
JOSE CARLOS BERGANTINOS DIAZ, )
MICHAEL HAMMER, and           )
JAIME ANDRADE,                )
            Defendants.       )
_____)
JOHN D. HOWARD individually   )
and as an assignee of         )
JAIME FRANKFURT, LLC,         )
            Plaintiff,        )
           -against-          ) 12 civ. 5263(PGG)
                              )
ANN FREEDMAN, GLAFIRA ROSALES,)
KNOEDLER GALLERY, LLC,        )
d/b/a KNOEDLER & COMPANY,     )
MICHAEL HAMMER, 8-31 HOLDINGS,)
INC., JOSE CARLOS BERGANTINOS )
DIAZ, and JAIME R. ANDRADE,   )
            Defendants.       )
_____)
```

DEPOSITION OF MICHAEL HAMMER
New York, New York
Wednesday, May 8, 2013
9:34 a.m.

Reported by:
Jennifer Ocampo-Guzman, CRR, CLR
JOB NO. 30070

2

```
1
2
3
4
5
6
7
8         May 8, 2013
9         9:34 a.m.
10
11        Deposition of MICHAEL HAMMER,
12   held at the offices of Fulbright &
13   Jaworski, LLP, 666 Fifth Avenue, New
14   York, New York, pursuant to notice,
15   before Jennifer Ocampo-Guzman, a Notary
16   Public of the State of New York.
17
18
19
20
21
22
23
24
25
```

4

```
1
2    APPEARANCES (Continued):
3    Attorneys for Defendant Ann Freedman
4      BOIES, SCHILLER & FLEXNER, LLP
5      10 North Pearl Street, 4th Floor
6      Albany, New York 12207
7      BY:  LUKE NIKAS, ESQ.
8        lnikas@bsfllp.com
9
10   Attorneys for Defendants Knoedler
11   Gallery, LLC, d/b/a Knoedler & Company,
12   Michael Hammer and 8-31 Holdings, Inc.
13     FULBRIGHT & JAWORSKI, LLP
14     666 Fifth Avenue
15     New York, New York 10103-3198
16     BY:  CHARLES D. SCHMERLER, ESQ.
17       cschmerler@fulbright.com
18       SARAH E. O'CONNELL, ESQ.
19       soconnell@fulbright.com
20       ANDRIUS R. KONTRIMAS, ESQ. (Houston)
21       akontrimas@fulbright.com
22
23
24
25
```

3

```
1
2    A P P E A R A N C E S:
3
4    Attorneys for Plaintiff John Howard
5      CAHILL PARTNERS, LLP
6      58 West 40th Street
7      New York, New York 10018
8      BY:  JOHN CAHILL, ESQ.
9        jcahill@CahillLawFirm.com
10
11   Attorneys for Plaintiffs Domenico De Sole
12   and Eleanore De Sole
13     CLARICK GUERON REISBAUM, LLP
14     40 West 25th Street, 12th Floor
15     New York, New York 10010
16     BY:  GREGORY A. CLARICK, ESQ.
17       gclarick@cgr-law.com
18       AARON CROWELL, ESQ.
19       acrowell@cgr-law.com
20
21
22
23
24
25
```

5

```
1
2    M I C H A E L   H A M M E R, called as a
3    witness, having been duly sworn by a Notary
4    Public, was examined and testified as
5    follows:
6    EXAMINATION BY
7    MR. CLARICK:
8        Q.  Good morning, Mr. Hammer.
9        A.  Good morning.
10       Q.  As I think you know, I'm Gregory
11   Clarick. I'm a lawyer in this action for the
12   plaintiffs, Domenico and De Sole, Domenico
13   and Eleanore De Sole.
14       This morning I will be asking you a
15   series of questions, and I would like you to
16   answer them to your best abilities.  If you
17   have any trouble understanding any question
18   that I ask at any time, please ask me to
19   rephrase it.  I would rather have a clear
20   record and know you understand my questions
21   than have you guessing at them, as if I asked
22   a poor question, which happens on occasion.
23       And I would ask that you actually
24   answer any question audibly, because the
25   court reporter can't take down nods or
```

2  (Pages 2 to 5)

158

1       Hammer
2   is no point going on and on about this.
3   Certainly you are entitled to take
4   whatever position you deem best. It is
5   not that I am not instructing him that
6   there is a privilege. What I am doing
7   is giving you an opportunity to get an
8   answer. You can infer, and we can agree
9   to this on the record, you can infer
10  that there is a privilege that attaches
11  by my statement, and so you will have, I
12  think, what you want. But I am allowing
13  you to get an answer and therefore
14  avoiding a fight later on.
15      If you choose not to take an
16  answer, that's your decision. I'm
17  simply, simply giving you an opportunity
18  to move the deposition along and get
19  some further information. But as I
20  said, it is certainly not my objective
21  to argue with you about it, you are free
22  to take whatever position you like, and
23  I won't debate it with you any further.
24      MR. CLARICK: Just so we're clear,
25  you may take whatever position as you

159

1       Hammer
2   think is appropriate. You may instruct
3   him as what you think is appropriate.
4   If Mr. Hammer answers questions, we
5   certainly are not agreeing that we do
6   not view that as a waiver. And to the
7   extent it is a waiver, and we're
8   entitled to enforce it as a waiver, we
9   have every intention of doing so.
10      MR. SCHMERLER: I must say that
11  that is a very odd and unusual position
12  to take in our business, but you are
13  free to take it. And I understand you
14  went out, you had a conference with Mr.
15  Howard's counsel, that's your view,
16  that's your view; but I must tell you,
17  you are on the wrong side of the fence
18  on this.
19      Go ahead. It's your deposition.
20  BY MR. CLARICK:
21      Q.  Mr. Hammer, did there come a time
22  that you learned that Knoedler was selling
23  works owned by Mr. X?
24      MR. SCHMERLER: You may answer yes
25  or no.

160

1       Hammer
2   A.  Yes.
3   Q.  When did you first hear that?
4       MR. SCHMERLER: I will instruct you
5   not to disclose anything which would
6   reflect on conversations with counsel,
7   but otherwise you may answer that
8   question.
9   Q.  You have no answer, you have no
10  answer that's not privileged? Is that
11  your --
12      MR. SCHMERLER: That's a legal
13  question. What I've instructed him is
14  not to answer, if it will reflect or
15  tend to disclose privileged
16  communications with counsel.
17  Q.  Did you ever discuss with
18  Ms. Freedman the sale of --
19      MR. CLARICK: Withdrawn.
20  Q.  Did you and Ms. Freedman ever
21  discuss Knoedler's sale of works owned by Mr.
22  X?
23  A.  I'm not -- I mean -- because I was
24  thinking about one thing, I'm not sure if Mr.
25  X, but I never would make it a policy or a

161

1       Hammer
2   habit of talking about any sales of any
3   pictures from anywhere. I mean that's just
4   not what I did. That was her job, her
5   business.
6       Again, I don't -- one thing that
7   I'm thinking of, and I don't know if it's Mr.
8   X, as you described it or not. I don't know
9   if I can put something out there that I can
10  remember. I don't know if it was Mr. X, I
11  don't know if it was responsive to what
12  you're asking.
13  Q.  What do you remember?
14  A.  It was not the sale of the picture
15  but the actual taking back of a picture that
16  she had sold. That's -- I didn't talk to her
17  about sales.
18  Q.  What picture are you recalling that
19  was taken back after it was sold?
20  A.  It was a -- I believe, I think, I
21  think it was a Jackson Pollock painting sold
22  to a Jack Levy.
23  Q.  And before you had a conversation
24  with Ms. Freedman about that painting, was
25  there ever an occasion that you and

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

262

1        Hammer
2        Q.  And before you came to New York,
3    did you have a discussion with anyone about
4    the substance of the business that you were
5    coming to New York to discuss?
6        A.  Absolutely not.  That's why I
7    hopped on a plane and came out.
8        Q.  Before that date, do you know
9    whether Knoedler Gallery had received a
10   subpoena from any government entity?
11       A.  I don't know about anything in the
12   past, but I know they had not received a
13   subpoena, no.
14       Q.  In connection with the Rosales
15   collection works?
16       A.  Yes, yes.
17       Q.  Do you know whether Herrick
18   conducted any kind of investigation, after
19   your first meeting with Herrick?
20       MR. SCHMERLER:  You can answer that
21   yes or no.
22       A.  Yes.
23       Q.  Do you know what Herrick did to
24   conduct its investigation?
25       MR. SCHMERLER:  I would caution you

263

1        Hammer
2    not to disclose any communications with
3    counsel.  Otherwise, you may answer that
4    question.
5        A.  I can't.
6        Q.  You can't.
7            Do you know if Herrick conducted
8    any interviews, in connection with the
9    investigation?
10       MR. SCHMERLER:  Same instruction,
11   do not disclose communications you
12   learned from counsel.  Otherwise, you
13   may answer that question.
14       A.  So I would say, other than with
15   counsel, I would say no.
16       Q.  Other than --
17       THE WITNESS:  Is that correct?
18       A.  I'm not sure how to word it
19   correctly.
20       Q.  Fine.
21           Just so that we're clear, other
22   than discussions you may have had with
23   counsel present, did you ever discuss with
24   any other Knoedler employee any interview
25   that Herrick had conducted, in connection

264

1        Hammer
2    with its investigation?
3        MR. SCHMERLER:  Objection to form.
4        You may answer.
5        A.  Could you --
6        Q.  Did you ever talk with another,
7    with a Knoedler employee about any, any
8    interview that Herrick conducted, in
9    connection with its investigation?
10       MR. SCHMERLER:  Same objection.
11       You can answer the question.
12       A.  I can't recall specifically.
13       Q.  Do you know if Herrick gathered
14   documents from Knoedler, in connection with
15   its investigation?
16       MR. SCHMERLER:  Yes or no, you can
17   answer.
18       A.  Yes.
19       Q.  Did Herrick gather any documents
20   from you, in connection with the
21   investigation?
22       MR. SCHMERLER:  Yes or no you can
23   answer.
24       A.  I don't know if that's a yes or no
25   answer.

265

1        Hammer
2        MR. SCHMERLER:  It is a yes or no
3    question.
4        Q.  It's a yes or no question.
5        MR. SCHMERLER:  You want to hear it
6    again?
7        THE WITNESS:  No.
8        A.  If you could just rephrase it.
9        Q.  Did you provider Herrick any
10   documents, in connection with its
11   investigation?
12       A.  Can you rephrase it again?
13       Q.  Did you, or someone on your behalf,
14   provide Herrick any documents, in connection
15   with the investigation?
16       A.  Not that I, from my personal, I
17   can't recall.  But, if you want to ask it
18   differently.
19           I'm happy to answer.  Do you want
20   me to answer the question?
21       MR. KONTRIMAS:  No.
22       A.  I know where you're going, I'm
23   trying give it to you.
24       MR. SCHMERLER:  No, no, don't
25   assume where he's going.  Mr. Clarick is

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

294

1    Hammer
2        Q. Do you recall, in October 2009, Mr.
3    Del Deo informing you that there the Rosales
4    and Masaccio pictures had had their
5    designation changed to "not for sale"?
6        A. I don't have a recollection of it,
7    but.
8        Q. Do you recall that, in fact --
9        MR. CLARICK: Well, withdraw the
10   question.
11       Q. Do you know what he's referring to
12   when he refers to the Rosales pictures?
13       A. Yes, I think.
14       Q. What is he referring to?
15       A. The Rosales pictures. The Rosales
16   pictures.
17       Q. Do you mean -- what do you mean by
18   that?
19       A. The way I read it is with respect
20   to the Rosales pictures.
21       Q. What works comprise the Rosales
22   pictures, to your understanding?
23       A. I couldn't tell you. I couldn't
24   list them.
25       Q. Well, without listing them, is

295

1        Hammer
2    there a way for you to describe, to your
3    understanding, what the Rosales pictures
4    were?
5        A. Yes.
6        Q. What's that?
7        A. My understanding, right or wrong,
8    would be pictures that were provided or
9    whatever from Rosales.
10       Q. In October 2009, did you have an
11   understanding as to how many pictures Ms.
12   Rosales had provided to Knoedler Gallery?
13       A. Not that I can recall at all.
14       Q. Did you ever come to have an
15   understanding as to how many pictures she
16   provided to Knoedler Gallery?
17       A. Total number? I couldn't tell you
18   the total number.
19       Q. Do you see the reference in that
20   line to the Masaccio pictures?
21       A. I do.
22       Q. And what were the Masaccio
23   pictures?
24       A. I have no recollection of what the
25   Masaccio pictures are.

296

1    Hammer
2        Q. Do you recall ever talking to
3    anyone about the Masaccio pictures?
4        A. No, I don't recall talking about
5    those pictures.
6        Q. With anyone?
7        A. I don't recall, yeah.
8        Q. Well, I'll just ask you about the
9    Rosales pictures, since you do recall those.
10       The document states that their
11   designation was changed to "not for sale."
12       Do you know why that occurred?
13       A. I believe so.
14       Q. Well, I'll ask you a foundational
15   question.
16       Do you know if, in fact, that
17   occurred?
18       A. I have no reason not to, so I don't
19   know for a fact, no.
20       Does it make sense?
21       Q. Is there an NFS, or not for sale,
22   designation in some Knoedler inventory system
23   or document?
24       A. It says here, but I don't -- I
25   don't know firsthand.

297

1        Hammer
2        Q. Okay. Do you know why the Rosales
3    pictures had their designation changed to
4    "not for sale"?
5        A. I believe so.
6        Q. Why is that?
7        A. Again, I'm not, I believe it was as
8    a result of questions being raised by
9    subpoena from the government.
10       Q. And did you have a discussion, at
11   or about this time, with Mr. Del Deo about
12   changing their designation to "not for sale"?
13       A. I don't recall having that
14   discussion.
15       Q. Do you recall having that
16   discussion with anybody?
17       A. I don't recall having that
18   discussion with anybody that I could
19   pinpoint, yes.
20       Q. This letter refers to an updated
21   list of Knoedler being sent -- Knoedler
22   inventory being sent to you.
23       Do you know what happened to that
24   list?
25       MR. SCHMERLER: Object to the form.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

298

Hammer

1
2  Q.  Well, do you know if you received
3  that list?
4      A.  I really don't have a recollection
5  of the letter or the list on that day, but.
6      Q.  Do you see that the letter has on
7  it, on the right-hand side, "via FedEx"?
8      A.  Yes.
9      Q.  To the best of your understanding,
10 did you receive this letter and the list by
11 FedEx?
12     A.  As I said, I don't recall; but I
13 don't see a reason why I --
14     Q.  Is there a reason why this letter
15 was not produced, as part of your production
16 in this lawsuit?
17         MR. SCHMERLER:  Object to the form.
18     A.  What do you mean, my production?
19     Q.  As part of the documents that were
20 produced in this lawsuit from your files.
21     A.  Because, as I said, I don't recall
22 seeing this, and I don't typically keep files
23 in my office.
24     Q.  And if you received a list in your
25 office --

299

Hammer

1
2          MR. CLARICK:  Well, let me withdraw
3  the question.
4      Q.  Is this the type of document that
5  you would not typically keep in your office?
6      A.  Type of document?  I don't
7  typically, as I stated earlier, keep
8  documents in my office.
9      Q.  What do you do with them, documents
10 that you receive in your office?
11     A.  Depends on the documents.
12     Q.  Well, what about this document,
13 what did you do with this document?
14     A.  As I stated earlier, I don't recall
15 receiving it, so I can't tell you what I did
16 with it.
17     Q.  What do you typically do with
18 documents that you receive in your office,
19 that you do not keep?
20     A.  Again, depending on the document, I
21 would shred it or get rid of it.
22     Q.  So is this the type of document
23 that you would shred?
24     A.  I don't, again, I don't recall
25 receiving it, it wasn't there.

300

Hammer

1
2      Q.  How about the list of
3  Knoedler-owned inventory, is that the type of
4  document you would typically not keep also?
5      A.  Perhaps.  It depends on what it is.
6      Q.  Did you recall receiving the list
7  of Knoedler-owned inventory?
8      A.  I think I already told you that I
9  didn't specifically recall any one of these.
10     Q.  If you did, if you did receive
11 them, but they're not in your possession,
12 would it be fair to conclude that you didn't
13 keep the documents, that, you know, you
14 shredded the documents, as you said?
15         MR. SCHMERLER:  Object to the form
16 of the question.
17     A.  No.
18     Q.  Was there somewhere else where you
19 would keep documents, when you received
20 documents in Culver City, if you were not
21 going keep them in your office?
22     A.  That's not what I was saying no to.
23     Q.  What were you saying no to?
24     A.  You asked me, if I were to receive
25 something like this in a list, a type of

301

Hammer

1
2  document that I would have shredded and I've
3  already told you I don't remember necessarily
4  receiving this.
5      Q.  Is there somewhere other than in
6  your office that you keep documents that you
7  receive in your office?
8      A.  In general or -- like, I mean.
9          MR. CLARICK:  Sorry, it's boring,
10 Chad.
11     A.  No, I mean in general or?
12     Q.  In general.
13     A.  Possibly, yes.
14     Q.  Where would that be?
15     A.  Where it originated, which would
16 have been in Franklin Del Deo's office or the
17 Knoedler's office.
18     Q.  If you kept a copy of this
19 document, you may have kept it at Knoedler?
20         MR. SCHMERLER:  Object to the form.
21     A.  It's not what I said.  You asked me
22 what it would be.  I said, if I received
23 this, and on which you stated, would I have
24 shredded or not, where else would I have kept
25 it, and I said I kept it at Knoedler where it

76  (Pages 298 to 301)

302

Hammer

1  Hammer
2  originated.
3  Q.  How would it -- how would you move
4  a document from your office in Culver City,
5  California to Knoedler?
6  MR. SCHMERLER:  Object to the form.
7  A.  Again, that's not what I said.  It
8  would be where it was originated, because I
9  wouldn't keep it.
10  Q.  You're referring to a copy of the
11  document may be kept at Knoedler?
12  A.  No, that's not what I said either.
13  Q.  Would you keep a copy of the
14  document at Knoedler?
15  A.  No.
16  Q.  Do you have any, do you have any
17  idea of where the list that's referenced in
18  the letter exists today?
19  MR. SCHMERLER:  Object to the form.
20  Q.  Or a copy of the list -- I'm sorry.
21  Do you have any idea where a copy
22  of the list that's referenced in the letter
23  is maintained today?
24  MR. SCHMERLER:  Object to the form,
25  lack of foundation.

303

Hammer

1  Hammer
2  A.  Definitively or generally?
3  Q.  Definitively.
4  A.  Then I would say, no.  I don't know
5  if the lawyers have it.  I don't know where a
6  copy of it is.
7  Q.  Do you have any kind of document
8  retention policy for your own business?
9  A.  For which?
10  Q.  Your own business.
11  MR. SCHMERLER:  Which business?
12  Q.  Do you have any, for your --
13  MR. CLARICK:  Let me withdraw the
14  question.
15  Q.  Does 8-31, to your knowledge, have
16  a document retention policy?
17  A.  Not to my knowledge.
18  Q.  Does Knoedler Gallery, to your
19  knowledge, have a document retention policy?
20  A.  Not to my knowledge.  That's why I
21  have accountant and auditors and lawyers, to
22  make sure that all those policies are in
23  place; but I'm not aware of them.
24  Q.  Did you personally take any steps,
25  after Knoedler received the subpoena from the

304

Hammer

1  Hammer
2  government, to ensure that you maintained
3  documents that were in your custody, related
4  to the subpoena?
5  A.  I just told you, I don't have any
6  documents; but I did what I was instructed,
7  which was to search.
8  Q.  Did you take any steps to ensure
9  that you, after that date that the subpoena
10  was served, after that date, did you take any
11  steps to ensure that you did not destroy any
12  documents that were maintained in your
13  custody that related to the matters concerned
14  in the subpoena?
15  A.  We have no documents.  Once the
16  subpoena was served, I would have done it.
17  Again --
18  Q.  After Ann Freedman resigned from
19  Knoedler, did Knoedler ever again put up for
20  sale the Rosales works?
21  MR. SCHMERLER:  Objection, asked
22  and answered.  Also objection, lack of
23  foundation.
24  Q.  Do you know?
25  A.  As I told you the last time you

305

Hammer

1  Hammer
2  asked me that, not that I'm aware.
3  Q.  And why not?
4  A.  Because they were not for sale.
5  Q.  Why were they maintained as not for
6  sale?
7  MR. SCHMERLER:  Objection, asked
8  and answered.
9  A.  The subpoena was received,
10  everybody looked at it, the lawyers,
11  everybody.  This is what we needed to do,
12  that's what was done.
13  Q.  Any other reason why they were not
14  put up for sale, again, other than what
15  counsel advised you to do?
16  MR. SCHMERLER:  Objection.
17  A.  What else -- again, that's --
18  they're not for sale; the subpoena says, the
19  lawyers say --
20  MR. SCHMERLER:  Please make an
21  effort not to disclose any
22  communications with counsel.  I know Mr.
23  Clarick doesn't want you to do that.
24  Q.  To the extent that there are works
25  that were provided by Glafira Rosales in

77  (Pages 302 to 305)

# Exhibit D

**Knoedler Gallery, LLC Privilege Log - [Updated 3/22/2013]**

| Doc ID | Document Type | Date | Description | From | To | CC | Privilege Type |
|---|---|---|---|---|---|---|---|
| KG-00006991 to KG-00006992 | E-mail | 8/28/09 | Email chain produced with confidential attorney-client communications redacted | Lord, Frank <lford@herrick.com> | Per Jensen <cpjensen@knoedlergallery.com> | Michael <rmah@hammerinternational.com> Rosenfeld, David <drosenfeld@herrick.com> | Attorney/Client |
| KG-00011129 | E-mail | 8/28/09 | Email produced regarding a Diebenkorn painting with confidential attorney-client communications redacted | Per Jensen <cpjensen@knoedlergallery.com> | Lord, Frank <lford@herrick.com> | | Attorney/Client |
| E00622404 | Document | 8/20/09 | Document created by Melissa De Medeiros for purpose of providing to lawyers in anticipation of litigation | Melissa De Medeiros | | | Attorney/Client Work Product; See In Re Grand Jury Proceedings, 2001 U.S. Dist. LEXIS 15646, at *96 (S.D.N.Y. Oct. 3, 2001) |
| E00627118 | Memo | 8/14/09 | Memorandum written by Melissa De Medeiros for purpose of providing to lawyers in anticipation of litigation | Melissa De Medeiros | | | Attorney/Client Work Product; See In Re Grand Jury Proceedings, 2001 U.S. Dist. LEXIS 15646, at *98 (S.D.N.Y. Oct. 3, 2001) |
| E00745155 | E-mail | 12/30/09 | Email chain including public relations consultants hired by lawyers to advise on responding to potential media questions during pendency of grand jury investigation | Kathleen M. Blomquist <kblomquist@rubenstein.com> | fddeo@fmo.blackberry.net Howard Shaw <howard@hammergalleries.com> Melissa De Medeiros <mdemedeiros@knoedlergalleries.com> | Andrius Kontrimas <akontrimas@fulbright.com> Frank Del Deo <fddeo@knoedlergallery.com> Marcia Horowitz <mhorowitz@rubenstein.com> Richard Lynch <richard@hammergalleries.com> | Attorney/Client Work Product; See In re Grand Jury Subpoenas Dated March 24, 2003, 265 F. Supp. 2d 321, 330 31 (S.D.N.Y. 2003) |
| E00745244 | E-mail | 1/5/10 | Email chain including public relations consultants hired by lawyers to advise on responding to potential media questions during pendency of grand jury investigation | Kathleen M. Blomquist <kblomquist@rubenstein.com> | Andrius Kontrimas <akontrimas@fulbright.com> Frank Del Deo <fddeo@knoedlergallery.com> Frank Deldeo <fddeo@fmo.blackberry.net> Kontrimas, Andrius R. <akontrimas@fulbright.com> Michael Hammer <mhh@ff77.com> Frank Del Deo <fddeo@knoedlergallery.com> | Kontrimas, Andrius R. <akontrimas@fulbright.com> Marcia Horowitz <mhorowitz@rubenstein.com> | Attorney/Client Work Product; See In re Grand Jury Subpoenas Dated March 24, 2003, 265 F. Supp. 2d 321, 330 31 (S.D.N.Y. 2003) |
| E00745565 | E-mail | 12/23/09 | Email chain including public relations consultants hired by lawyers to advise on responding to potential media questions during pendency of grand jury investigation | | Frank Del Deo <fddeo@knoedlergallery.com> | Kontrimas, Andrius R. <akontrimas@fulbright.com> Marcia Horowitz <mhorowitz@rubenstein.com> | Attorney/Client Work Product; See In re Grand Jury Subpoenas Dated March 24, 2003, 265 F. Supp. 2d 321, 330 31 (S.D.N.Y. 2003) |

1

# Exhibit E

radelman@lynncahill.com

September 19, 2012

**BY E-MAIL**

Charles D. Schmerler, Esq.
Fulbright Jaworski LLP
666 Fifth Avenue, 31st Floor
New York, NY 10103

Luke Nikas, Esq.
Boies, Schiller & Flexner LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022

Silvia L. Serpe, Esq.
Serpe Ryan LLP
1115 Broadway, 11th Floor
New York, NY 10010

Anastasios Sarikas, Esq.
23-09 31st Street
Astoria, NY 11105

Re:   *Howard v. Freedman, et al.,* 12 CV 5263 (PGG)

Dear Counsel:

Now that the parties' pre-motion letters are complete, we write to request that the parties schedule the conference required by Rule 26(f) as soon as possible, but in any event no later than September 28, 2012. There is no conceivable reason to delay the conference. Judge Gardephe has ruled that discovery in the *Lagrange* and *DeSole* cases will move forward notwithstanding pending motions to dismiss, and we expect that he will do likewise in the *Howard* case. In the August 22 Court conference in *DeSole*, the Court stated that:

> To state the obvious, this is a case that cries out for cooperation
> between counsel because of the overlap in cases and the potential
> for an enormous waste of time and money if witnesses that are
> addressed in topics in more than one case are repeatedly deposed.

Plaintiffs' counsel in the *DeSole* case has informed us that they plan to move forward with depositions, including third-party depositions, expeditiously. In furtherance of the

LYNN | CAHILL LLP

September 19, 2012
Page 2 of 2

cooperation that Judge Gardephe urged, we are willing to participate in those depositions
to reduce overlap to the extent possible. However, such participation is impossible
without, at a minimum, the parties' Rule 26 initial disclosures and the production to us of
all documents already produced in the *Lagrange* and *DeSole* cases. We know that
Knoedler and Ms. Freedman have already made such productions, and thus producing
them to us should involve no more than burning a new CD. Similarly, we believe that
Ms. Rosales and Mr. Andrade have already been subpoenaed and, we assume, produced
or at least reviewed document. Mr. Andrade has already provided documents to Knoedler
and Freedman in connection with the preliminary injunction hearing that he maintains,
according to Ms. Freedman, in boxes at his home. We therefore formally request their
production no later than no later than September 28, 2012. On our end, we are willing to
make initial disclosures and produce documents quickly, as we said in our e-mail of
*August 8* to counsel for the Knoedler defendants and Freedman and now reiterate to all
counsel. Indeed, we are ready to provide initial disclosures by that date, and to produce
documents within two weeks of service of document requests. Our requests for the
production of documents already produced in the related cases, however, have to date
been met with silence. Continued silence or a refusal to produce the referenced
documents will be a clear sign that defense counsel is not interested in cooperation,
notwithstanding the Court's stated wishes, and that there will be a further "waste of time
and money."

Please respond to this letter no later than the close of business, September 21, 2012.
Thank you.

Very truly yours,

Ronald W. Adelman

# Exhibit F

1

```
        Cc6nlesc                    Conference
 1      UNITED STATES DISTRICT COURT
 1      SOUTHERN DISTRICT OF NEW YORK
 2      ----------------------------------x
 2
 3      DeSOLE ELEANORE et al.
 3
 4                   Plaintiffs
 4
 5              v.                            12 CV 2313 (PGG)
 5
 6      KNOEDLER GALLERY LLC, et al
 6
 7                   Defendants
 7
 8      -----------------------------x
 8
 9      JOHN D. HOWARD,
 9
10                   Plaintiff,
10
11              v.                            12 Civ. 5263 (PGG)
11
12      ANN FREEDMAN, et al.,,
12
13                   Defendants.
13
14      -----------------------------x
14
15                                        New York, N.Y.
15                                        December 6, 2012
16                                        4:00 p.m.
16
17      Before:
17
18                      HON. PAUL G. GARDEPHE
18
19                                        District Judge
20
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

42

```
        Cc6nlesc                    Conference
 1      going to participate in depositions, he has an obligation to
 2      give me the documents so I can defend the depositions.  That
 3      seems pretty straightforward to me.
 4              THE COURT:  You say defend depositions.  These are
 5      Knoedler witnesses?
 6              MR. SCHMERLER:  They have noticed them.  I assume we
 7      will have some questions.  This is stuff that I have understood
 8      to be fairly straightforward over the years that I have
 9      practiced law.
10              You get document production and you do witnesses.
11      Parties don't come and take depositions without having produced
12      the documents.  Your Honor made that statement at the last
13      hearing.  I don't know why we're going around with this.
14              THE COURT:  We are dealing with a situation,
15      Mr. Schmerler, where the representation has been made that you
16      failed to produce documents that are sitting on a disk in your
17      office right now that were produced in another case.
18              What is your explanation.
19              MR. SCHMERLER:  It is irrelevant to this.
20              THE COURT:  It is irrelevant.  How could it possibly
21      be irrelevant, all the documents in the Lagrange case, how
22      could they possibly all be irrelevant to this case.
23              MR. SCHMERLER:  No, it's not relevant to this
24      discussion we are having now, your Honor.  We are prepared to
25      produce documents.  I don't want to lead this down a silly
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

```
       Cc6nlesc                    Conference
 1     path.  The hour is late, and I understand the Court's view of
 2     this.
 3               I don't want to start an argument about this.  When it
 4     comes to specific depositions, my point is I need documents,
 5     they need documents, we need to get this done.  I don't want to
 6     argue about this.
 7               THE COURT:  So why hasn't it happened?  Why hasn't it
 8     happened?
 9               Everyone here has represented they have been
10     completely obstructed at every turn.  So, as I have said, I am
11     not going to spend every day between now and July 2013 trying
12     to figure out who served which document requests first, who
13     refused to respond to it first.  It is just silliness.
14               At some point lawyers have to take responsibility for
15     the case.  They know their obligations.  I set a deadline, and
16     if you don't have any discovery, then we'll go to trial without
17     any discovery.
18               I am not going to get into this level of detail with
19     you.  You know your responsibilities as lawyers.  You have the
20     deadline for discovery.  You will either cooperate or you
21     won't.
22               If you won't, I suppose there will be no discovery and
23     we will go to trial without discovery.  That's where we are.
24               You are going to have to figure it out.
25               MR. SCHMERLER:  That is fully acceptable to us, your
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

# Exhibit G

# LYNN | CAHILL LLP

jcahill@lynncahill.com

2012-December-18

**BY E-MAIL**

Charles D. Schmerler, Esq.
Fulbright & Jaworski LLP
666 Fifth Avenue, 31st Floor
New York, New York 10103

Re: *Howard v. Freedman, et al.,* 12 CV 5263 (PGG)

Dear Mr. Schmerler:

It is unclear to us what objections you have to the production of documents in light of your telephone call to us yesterday or even what the purpose of your call was. As we have made clear, at this time no expert report has been prepared with regard to the "de Kooning" at issue in this case. We reiterate that when expert discovery is appropriate, we will produce any reports that may be created in support of our claims. Whatever other plaintiffs have done, there is no requirement that a plaintiff have an expert report prepared in advance of filing a complaint and, indeed, that is not the usual course.

With regard to the fact discovery that Judge Gardephe has ordered to take place, we are prepared to provide documents that we have collected so far from Messrs. Howard and Frankfurt concerning the purchase of the "de Kooning" to you no later the end of the day tomorrow.

Your statement last night that we will "see nothing" from you absent the production of an expert report in is troubling on a number of grounds. We again reiterate our request for at least the documents already produced in the *Lagrange* and *De Sole* actions (and, by copy of this letter to Mr. Nikas make the same request of defendant Freedman), which we understand can be easily produced on a disk. Judge Gardephe made it clear to all parties that the Court expected document production to move forward expeditiously. We are prepared to do so and the defendants should do so as well.

Very truly yours,

John R. Cahill

Copy to: Luke Nikas, Esq. (by electronic mail)

# Exhibit H

# KNOEDLER & COMPANY
— ESTABLISHED 1846 —
19 EAST 70 STREET  NEW YORK NEW YORK 10021

March 23, 2006

Jay H. Shidler, II
The Shidler Group
Davies Pacific Center
841 Bishop Street, Suite 1700
Honolulu, HI 96813

Dear Jay:

As promised, I am happy to enclose some background information on Motherwell's Elegy series. I believe the most thorough and important study on the Elegies was published in the 1978 exhibition catalogue *American Art at Mid-Century: The Subjects of the Artist*, National Gallery of Art, Washington, written by the then curator E. A. Carmean, Jr. There are many descriptive and informative passages in the essay including the following one:

> *The final subject in each individual Elegy—its particular spirit, its separate meditation on life and death—is determined by the making of the picture out of its constituent parts. In this sense the Elegies (as a series) are fragmentary, although each is complete as a picture or as a speech. They correspond to our experience of the modern world, which we only partially know and not from a fixed point of view. "I learned that I can't say it all in one work," says the artist.*

Additionally, I am enclosing articles on Motherwell's general oeuvre, all three written by H.H. Arnason, author of the major monograph on Motherwell, first published in 1977. We were able to reprint these articles from past copies of Art International, archived in the Knoedler library.

I know you will soon be receiving your most beautiful and commanding Motherwell Elegy. I hope you will treasure it for years to come. I look forward to having the pleasure of seeing you when you are next in New York and in the meantime please let us know if we can be of any further assistance.

With all best,

Ann Freedman
President

JSHD00022

# Exhibit I



**FULBRIGHT**
*&Jaworski L.L.P.*
Attorneys at Law

Fulbright Tower • 1301 McKinney, Suite 5100 • Houston, Texas 77010-3095
akontrimas@fulbright.com • Direct: 713 651 5482 • Main: 713 651 5151 • Facsimile: 713 651 5246

January 5, 2012

Mr. Howard A. Nagelberg
Barack Ferrazzano Kirschbaum & Nagelberg LLP
200 West Madison Street, Suite 3900
Chicago, Illinois 60606.

Dear Mr. Nagelberg:

Thank you for your letter dated December 19, 2011 regarding two paintings by Krasner and Motherwell, respectively, held by your clients, Jay and Wallette Shidler. I am taking this opportunity to respond to your letter on behalf of my clients, Knoedler Gallery, LLC and Michael A. Hammer. Please excuse the delay in responding to your letter but as you may know Knoedler has publicly announced its closing. Given that the business has existed for over 150 years, Knoedler is now in the laborious process of winding down and liquidating its art inventory in a deliberative manner. Consequently, neither it nor Mr. Hammer are in a position to open a dialogue with your clients regarding the purchase by Knoedler or Mr. Hammer of any paintings.

Very truly yours,

Andrius R. Kontrimas

ARK

95407229.1

AUSTIN • BEIJING • DALLAS • DENVER • DUBAI • HONG KONG • HOUSTON • LONDON • LOS ANGELES • MINNEAPOLIS
MUNICH • NEW YORK • PITTSBURGH-SOUTHPOINTE • RIYADH • SAN ANTONIO • ST. LOUIS • WASHINGTON DC
www.fulbright.com

JSHD00056

Exhibit J

### BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

200 WEST MADISON STREET, SUITE 3900
CHICAGO, ILLINOIS 60606

Howard A. Nagelberg
(312) 984-3198
Voice Mail Ext. 4198
howard_nagelberg@bfkn.com

Telephone (312) 984-3100
Facsimile (312) 984-3150

December 19, 2011

**VIA UPS OVERNIGHT DELIVERY AND**
**FIRST CLASS MAIL**

Michael A. Hammer, Chairman and Chief Executive Officer
Armand Hammer Foundation
9510 Jefferson Boulevard
Culver City, CA 90232-2918

     Re:   <u>Knoedler Gallery, LLC – Jay and Wallette Shidler</u>

Dear Mr. Hammer:

Our clients, Jay and Wallette Shidler, of Honolulu, Hawaii, own two (2) pieces of fine art that they purchased from the Knoedler Gallery in New York City. One is a Motherwell, purchased for $2.2M, and the other is a Krasner, purchased for $1.0M. Based on media reports and recent court filings, it is our understanding that you are the sole principal of Knoedler.

Based on their substantial economic and emotional investment in the Knoedler pieces, our clients have been following with interest recent media reports questioning the authenticity of certain New York School abstract expressionist works sold by Knoedler, including those attributed to Motherwell and Krasner, as well as Jackson Pollock. They have also become aware of the litigation regarding those issues.

From the time of purchase until the recent reports, our clients steadfastly believed in and relied upon the authenticity of the pieces in question, and they continue to hope that each of them can stand up to any form of vetting. Unfortunately, under the cloud of uncertainty created by recent publicity, it is extremely difficult for them to continue to enjoy or adequately insure the pieces, or to pursue their disposition in a manner consistent with their eleemosynary intentions concerning their art collection, without submitting them to certain forensic vetting processes, which our clients would much prefer to avoid for a variety of reasons.

It appears to us, admittedly from a distance, that you continue to fervently believe that the works sold by Knoedler are authentic. For that reason, our clients would like to open a dialogue with you concerning the possibility of your repurchasing their Motherwell and Krasner pieces. Such a transaction would enable my clients to avoid the vetting of those pieces. While our clients would be willing, and would prefer, to execute such disposition discretely and on a confidential basis, they would be willing to consider a less private approach if that would somehow assist you in demonstrating your sincerity re the authencity of the pieces sold by Knoedler.

745320_1.DOC

BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

Michael A. Hammer
December 19, 2011
Page 2

Please let us know whether the disposition referred to above is of any interest to you. If it is, we will put you in touch with our clients. Thank you.

Very truly yours,

Howard A. Nagelberg

HAN/lmg

745320_1.DOC

JSHD00058

Exhibit K

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------
JOHN D. HOWARD, individually and as
assignee of Jaime Frankfurt, LLC,
        Plaintiff,
  -against-     12-CV-5263
           (PGG)(HBP)
ANN FREEDMAN, GLAFIRA ROSALES,
KNOEDLER GALLERY, LLC d/b/a
KNOEDLER & COMPANY, MICHAEL HAMMER,
8-31 HOLDINGS, INC., JOSE CARLOS
BERGANTINOS DIAZ, and JAIME R.
ANDRADE,

     Defendants.
----------------------------------------
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------
DOMENICO De SOLE and ELEANORE De SOLE,
individually and as assignees of
LAURA De Sole,
       Plaintiffs,
  -against-    No. 12 Civ.
         2313(PGG)
KNOEDLER GALLERY, LLC d/b/a KNOEDLER &
COMPANY, ANN FREEDMAN, GLAFIRA
ROSALES, JOSE CARLOS BERGANTINOS DIAZ,
MICHAEL HAMMER and JAIME ANDRADE,

     Defendants.
----------------------------------------

     April 29, 2013
     HOWARD SHAW

HUDSON REPORTING & VIDEO    1-800-310-1769

---

Page 2

2          April 29, 2013
           9:43 a.m.
3
4
5    Deposition of HOWARD SHAW, taken by Plaintiffs,
6    pursuant to Subpoena, held at the offices of
7    Lynn & Cahill LLP, 58 West 40th Street, New
8    York, New York, before Joseph R. Danyo, a
9    Shorthand Reporter and Notary Public within
10   and for the State of New York.

---

Page 3

1
2  A P P E A R A N C E S :
3
     LYNN & CAHILL LLP
4     Attorneys for Plaintiffs
     58 West 40th Street
5     New York, New York 10018
6     By: PAUL COSSU, ESQ.
7
8     BOIES SCHILLER & FLEXNER LLP
     Attorneys for Defendant Ann Freedman
9     10 North Pearl Street
     Fourth Floor
10    Albany, New York 12207
11    By: KYLE SMITH, ESQ.
12
13    FULBRIGHT & JAWORSKI LLP
     Attorneys for Defendants Knoedler
14     Gallery, LLC, Michael Hammer and
     8-31 Holdings, Inc.
15    666 Fifth Avenue
     New York, New York 10103-3198
16
     By: MARK A. ROBERTSON, ESQ.
17
18        oOo
19
20
21
22
23
24
25

---

Page 4

1             Shaw
2   H O W A R D.  S H A W, having been first duly
3  sworn by Joseph R. Danyo, a Notary Public for the
4  State of New York, was examined and testified as
5  follows:
6  EXAMINATION BY MR. COSSU:
7     Q.  Good morning, Mr. Shaw.  My name is
8  Paul Cossu.  I represent John Howard in a case he
9  has against Ann Freedman, Knoedler Gallery, 8-31
10  Holdings, Jaime Andrade, Glafira Rosales and Jose
11  Carlos Bergantinos Diaz.
12     I am going to ask you some questions
13  relating to that lawsuit today.  Have you ever
14  been deposed before?
15     A.  Yes.
16     Q.  So you may be familiar with this, but
17  I will just give you a couple of quick ground
18  rules to follow.  Please wait until I finish a
19  question before you begin to answer just so for
20  the court reporter's sake, he can only take down
21  one person at a time and we want to have a clear
22  record for everyone.
23     Feel free to ask for a break at any
24  time.  The only request I make is that if a
25  question is pending, you answer the question

Page 41

```
 1                  Shaw
 2        Q.  So the three meetings took place
 3   before the meeting where she was put on
 4   administrative leave?
 5        MR. ROBERTSON:  Objection to form.
 6        Q.  The three meetings took place before
 7   the meeting where Ann was told that she was being
 8   put on administrative leave?
 9        MR. ROBERTSON:  Objection to form.
10        A.  I believe so.
11        Q.  Were there any subsequent meetings
12   with Ms. Freedman?  Did you have any subsequent
13   meetings with Ms. Freedman?
14        A.  No.
15        Q.  Since receiving the FBI subpoena or
16   since Knoedler received the FBI subpoena, have
17   you had any discussions with anyone other than
18   attorneys about Glafira Rosales?
19        A.  Yes.
20        Q.  Who have you had discussions with?
21        A.  What do you mean by discussion?
22        Q.  Has her name come up in conversation?
23        A.  Many people in the art world are
24   curious about her and Knoedler, and so I am
25   periodically asked about it, to which I reply I
```

Page 42

```
 1                  Shaw
 2   cannot discuss it.
 3        Q.  Have you ever discussed Ms. Rosales
 4   in depth or in further depth with anyone?
 5        A.  Not that I recall.  If I did, it
 6   would have been about a newspaper article.
 7        Q.  Have you discussed Glafira Rosales
 8   with Richard Lynch?
 9        A.  Yes.
10        Q.  Outside the presence of attorneys?
11        A.  Yes.
12        Q.  And what did you discuss with him?
13        A.  He told me that Knoedler had received
14   a painting or paintings from a woman which Ann
15   was selling for significant profits.
16        Q.  When was this meeting or when was
17   this discussion?
18        A.  I don't recall.
19        Q.  Was it before the FBI subpoena was
20   received by Knoedler?
21        A.  Yes.
22        Q.  What did you say to Richard Lynch in
23   response to what he told you?
24        A.  I said I was surprised that someone
25   could make such large profits on a painting, or
```

Page 43

```
 1                  Shaw
 2   it may have been paintings, and I found it
 3   surprising and troubling.
 4        Q.  Did Mr. Lynch give you an idea of the
 5   scale of the profits that Knoedler was receiving
 6   on these sales?
 7        MR. ROBERTSON:  Objection to form.
 8        MR. SMITH:  Objection.
 9        A.  He said they were large profits.
10        Q.  What did you understand that to mean?
11        A.  That they were large profits.
12        Q.  Did Mr. Lynch express concern about
13   the size of the profits?
14        A.  Not that I recall.
15        Q.  What did he say when you told him
16   that you found it surprising and troubling?
17        A.  He said that the paintings were fresh
18   to the market, but that Ann was working with her
19   attorney to get them into the appropriate
20   catalogue raisonné or obtain the appropriate
21   certificate of authenticity.
22        Q.  Did you have any understanding as to
23   which attorney Ms. Freedman was working with?
24        A.  I believe it was Ron Spencer.
25        Q.  Why did you find it troubling that
```

Page 44

```
 1                  Shaw
 2   Ms. Freedman was making such large profits from
 3   these sales?
 4        MR. ROBERTSON:  Objection to form.
 5        MR. SMITH:  Objection.
 6        A.  Because in my business I find it
 7   difficult to make large profits.
 8        Q.  Did you relay these concerns to
 9   anyone other than Richard Lynch?
10        A.  Not that I recall.
11        Q.  Did you ever discuss Ms.
12   Freedman's -- the large profits Knoedler was
13   receiving with Michael Hammer?
14        MR. ROBERTSON:  Outside of attorneys.
15        A.  Richard said that Michael was aware
16   of them.
17        Q.  And you don't recall when this
18   conversation took place?
19        A.  No.
20        Q.  But it took place before the FBI
21   subpoena was received?
22        A.  Yes.
23        Q.  Did Richard say anything else to you
24   about Mr. Hammer's understanding of these sales?
25        A.  No.
```

Page 45

Shaw

1
2    Q.  Did Richard say anything else to you
3  about the sales besides the large profits that
4  Ann was receiving?
5    A.  Not in addition to what I have
6  already told you.
7    Q.  Did he mention Glafira Rosales at
8  all?
9    A.  I don't recall.
10    Q.  Did he mention the provenance of the
11  works?
12    A.  Can you be more specific.
13    Q.  You mentioned he said they were fresh
14  to the market.  What did you understand that to
15  mean?
16    A.  That they were new discoveries.
17    Q.  Did he say anything about where they
18  came from, the works came from?
19    A.  He said from a client of Ann's.  He
20  may or may not have used her name.
21    Q.  Did he give any indication as to
22  where the client obtained the works from?
23    A.  Not that I recall.
24    Q.  Did he express any concern about
25  where the works were coming from?

Page 46

Shaw

1
2    A.  Some.
3    Q.  What concern did he express?
4    A.  Not so much concern, but that, though
5  the works were new discoveries, that Ann was
6  getting them into catalogue raisonnés or getting
7  certificates.  He may have said she already had
8  received some.
9    Q.  Did he make any statements as to the
10  size of the collection that Ann Freedman was
11  selling?
12    A.  No.
13    Q.  Did you inquire into how many works
14  Ann Freedman was receiving from this client?
15    A.  No.
16    Q.  Did you ever inquire into how many
17  works Ann had received from this client?
18    A.  Yes.
19    Q.  Outside of conversations with
20  attorneys?
21    A.  No, with attorneys.
22    Q.  And this was all after the FBI
23  subpoena was issued?
24    A.  No.
25    MR. SMITH:  Objection.

Page 47

Shaw

1
2    Q.  You had discussions with attorneys
3  about the size of the collection before the FBI
4  subpoena was issued?
5    MR. ROBERTSON:  Objection.
6    I'm not going to let you answer what
7  you talked about with attorneys.
8    MR. COSSU:  Mark that for the record,
9  please.  Just to be clear, that last
10  question was if he had discussions prior
11  to the FBI?
12    MR. ROBERTSON:  No, your question was
13  did he have discussions about the size or
14  the number of paintings or something.
15    MR. COSSU:  Correct.  You are right.
16    Q.  Did you have discussions with
17  attorneys prior to the FBI subpoena being issued?
18    A.  Yes.
19    Q.  Did Michael Hammer ever express to
20  you any concern that Knoedler might be selling
21  inauthentic works of art?
22    A.  No.
23    Q.  Did you ever express any concern to
24  Michael Hammer that Knoedler might be selling
25  inauthentic works of art?

Page 48

Shaw

1
2    A.  Whatever discussions I may have had
3  on that topic would have been with our attorneys.
4    Q.  To your knowledge, did Richard Lynch
5  ever have any discussions with Mr. Hammer
6  concerning the potential sale of inauthentic
7  works of art?
8    A.  I don't know.
9    MR. COSSU:  Let's mark as Plaintiffs'
10  Exhibit 221-A a document Bates stamped
11  KG 00011154 to 00011161.
12    (Plaintiffs' Exhibit 221-A, Document
13  bearing Bates numbers KG 00011154 to
14  00011161, was so marked for
15  identification, as of this date.)
16    Q.  Can you tell me what this exhibit is?
17    A.  It is four articles from The New York
18  Times.
19    Q.  What is the subject matter of these
20  articles?
21    A.  A group of paintings purported to be
22  by Jackson Pollock.
23    Q.  Did you send these articles to Mr.
24  Hammer?
25    A.  Yes.

Exhibit L

574

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

DOMENICO DE SOLE and          )
ELEANORE DE SOLE,             )
individually and as assignees )
of LAURA DE SOLE,             )
            Plaintiffs,       )
            -against-         ) 12 civ. 2313(PGG)
                              )
KNOEDLER GALLERY, LLC,        )
d/b/a KNOEDLER & COMPANY,     )
ANN FREEDMAN, GLAFIRA ROSALES, )
JOSE CARLOS BERGANTINOS DIAZ, )
MICHAEL HAMMER, and           )
JAIME ANDRADE,                )
            Defendants.       )
                              )
JOHN D. HOWARD individually   )
and as an assignee of         )
JAIME FRANKFURT, LLC,         )
            Plaintiff,        )
            -against-         ) 12 civ. 5263(PGG)
                              )
ANN FREEDMAN, GLAFIRA ROSALES, )
KNOEDLER GALLERY, LLC,        )
d/b/a KNOEDLER & COMPANY,     )
MICHAEL HAMMER, 8-31 HOLDINGS, )
INC., JOSE CARLOS BERGANTINOS )
DIAZ, and JAIME R. ANDRADE,   )
            Defendants.       )
                              )


            CONTINUED VIDEOTAPED DEPOSITION OF
                      ANN FREEDMAN
                  New York, New York
                  Monday, May 6, 2013
                      2:12 p.m.

Reported by:
Jennifer Ocampo-Guzman, CRR, CLR
JOB NO. 30026

575

```
 1
 2
 3
 4
 5
 6
 7
 8                  May 6, 2013
 9                  2:12 p.m.
10
11          Continued Videotaped Deposition
12      of ANN FREEDMAN, held at the offices of
13      Cahill Partners, 58 West 58th Street,
14      New York, New York, pursuant to notice,
15      before Jennifer Ocampo-Guzman, a Notary
16      Public of the State of New York.
17
18
19
20
21
22
23
24
25
```

577

```
 1
 2      APPEARANCES (Continued):
 3        Attorneys for Defendant Ann Freedman
 4          BOIES, SCHILLER & FLEXNER, LLP
 5          575 Lexington Avenue, 7th Floor
 6          New York, New York 12207
 7          BY: NICHOLAS A. GRAVANTE, JR., ESQ.
 8             ngravante@bsfllp.com
 9
10
11        Attorney for Defendant Glafira Rosales
12        and Jose Carlos Bergantinos Diaz
13          ANASTASIOS SARIKAS, ESQ.
14          23-09 31st Street
15          Astoria, New York 11105
16          BY: ANASTASIOS SARIKAS, ESQ.
17             tassos54@yahoo.com
18
19
20      ALSO PRESENT:
21          CARLOS KING, Videographer
22
23
24
25
```

576

```
 1
 2      A P P E A R A N C E S :
 3
 4      Attorneys for Plaintiff John Howard
 5          CAHILL PARTNERS, LLP
 6          58 West 40th Street, 2nd Floor
 7          New York, New York 10018
 8          BY: JOHN CAHILL, ESQ.
 9             jcahill@CahillLawFirm.com
10          PAUL COSSU, ESQ.
11             pcossu@CahillLawFirm.com
12
13      Attorneys for Plaintiffs Domenico De Sole
14      and Eleanore De Sole
15          CLARICK GUERON REISBAUM, LLP
16          40 West 25th Street, 12th Floor
17          New York, New York 10010
18          BY: GREGORY A. CLARICK, ESQ.
19             gclarick@cgr-law.com
20          AARON CROWELL, ESQ.
21             acrowell@cgr-law.com
22
23
24
25
```

578

```
 1
 2          THE VIDEOGRAPHER: This begins the
 3      video, the continued video deposition of
 4      Ann Freedman, in the matter of John D.
 5      Howard versus Ann Freedman, et al., and
 6      Domenico De Sole, et al., versus
 7      Knoedler Galleries LLC, et al., in the
 8      United States District Court, Southern
 9      District of New York.
10          This deposition is being held at
11      58 West 40th Street, New York, New York,
12      on May 6, 2013, at approximately 2:12
13      p.m.
14          My name is Carlos King, from the
15      firm of David Feldman Worldwide, and I
16      am the legal video specialist. The
17      court reporter is Jen Ocampo-Guzman, in
18      association with David Feldman
19      Worldwide.
20          Will counsel please introduce
21      themselves.
22          MR. CLARICK: I'm Gregory Clarick
23      from Clarick Gueron Reisbaum, here on
24      behalf of Domenico De Sole. I'm also
25      here with my colleague, Aaron Crowell,
```

611

```
1             Freedman
2  reporting to anyone the profit that Knoedler
3  made on this sale?
4        MR. GRAVANTE:  Objection to the
5  form.
6        A.  I recall this was internal
7  information, and I don't recall my discussion
8  about the sale with anybody outside of
9  Knoedler.
10       Q.  How about within Knoedler?
11       A.  Though, as I sit here, I don't
12 recall specific conversation, but there
13 wasn't anyone within Knoedler that couldn't
14 or wouldn't know what our internal financial
15 information would be on any sale.
16       Q.  Well, did you discuss this sale
17 with Pete Sansone?
18       A.  To my recollection, yes.
19       Q.  And what do you remember telling
20 Mr. Sansone about this sale?
21       A.  It would be, as I can recall, that
22 I made the sale, and here were the numbers.
23       Q.  Did you tell him it was a
24 particularly profitable sale?
25       MR. GRAVANTE:  Objection to the
```

612

```
1             Freedman
2  form.
3        Q.  Did he comment?  What did he say
4  back to you about the sale?
5        A.  I do not specifically recall.
6        Q.  Did you discuss this particular
7  sale with Mr. Hammer?
8        A.  I do not recall a specific
9  conversation, but I certainly may have; but
10 he was knowledgeable about sales.
11       Q.  I note at the beginning of the
12 deposition, Mr. Gravante made comments about
13 the word "specific," and I guess with those
14 in mind, I'm going to ask you, do you have a
15 general recollection of a conversation with
16 Mr. Hammer about this, about this particular
17 sale?
18       A.  Generally, I told Mr. Hammer about
19 sales that were, in my view, important and
20 significant.
21       Q.  And was this an important and
22 significant sale for Knoedler?
23       A.  Yes, it was.
24       Q.  Can you recall, as you're sitting
25 here, any other important and significant
```

613

```
1             Freedman
2  sales for Knoedler, in connection with Mr.
3  X's collection?
4        A.  I considered every sale of these
5  works, which were of the highest quality,
6  they were rare, important abstract
7  expressionists' works; and any one of them I
8  would have singularly discussed with Mr.
9  Hammer.
10       Q.  I don't want to pick at your words,
11 but just so the record is perfectly clear, is
12 it your testimony that because these sales
13 were important and significant to Knoedler,
14 your recollection is that you discussed each
15 of them with Mr. Hammer?
16       A.  My recollection, in general, is
17 that I would, or I did inform Mr. Hammer.
18       Q.  Of each of these sales, from the
19 works that were owned by Mr. X?
20       A.  My general recollection is that I
21 informed him of each of these sales.
22       MR. CLARICK:  Could we take a break
23 for a minute.
24       THE VIDEOGRAPHER:  Yes.  The time
25 is 2:59 p.m., and we're off the record.
```

614

```
1             Freedman
2  (A brief recess was taken.)
3        THE VIDEOGRAPHER:  The time is
4  3:12 p.m., and we're back on the record.
5  EXAMINATION BY
6  MR. SARIKAS:
7        Q.  Ms. Freedman --
8        MR. CLARICK:  Can you just make
9  sure that it's clear -- I'm sure that it
10 is -- that the next few questions are
11 going to be asked by Mr. Sarikas, as
12 counsel to Ms. Rosales.
13       MR. SARIKAS:  And Mr. Bergantinos,
14 correct.  And thank you very much.
15 BY MR. SARIKAS:
16       Q.  Ms. Freedman, good afternoon to
17 you.  I have three questions to ask you.  The
18 first question is as follows:  Did you ever
19 meet Carlos Bergantinos?
20       A.  No, I never met Carlos Bergantinos.
21       Q.  When the De Soles bought the
22 Rothko, is it correct to say that they bought
23 a painting belonging to Knoedler?
24       MR. CAHILL:  Objection, form.
25       MR. SARIKAS:  Well, let me rephrase
```

11  (Pages 611 to 614)